MORRIS L. RITCHIE *v.* MORGAN RICHARDS ET AL.

STATUTES—ENACTMENT—LEGISLATIVE JOURNALS—EVIDENCE—JUDI-
CIAL NOTICE—SCOPE OF TITLE—CONSTRUCTION—DISTRICT JUDGE
— TERM OF OFFICE — ELECTIONS — CANDIDATES — SECRECY OF
BALLOT—CONSTITUTIONAL LAW—JURISDICTION OF COURTS.

1. The title of an act, expressed as follows: "An act relating to
and making sundry provisions concerning elections," limits
its subject to provisions concerning elections, and is suffi-
ciently definite and certain, under section 23, art. 6, of the
constitution of the state of Utah.

2. When the language of the title is, in terms limited to provi-
sions concerning elections, provisions concerning appointments
to office cannot be included in the law; but, if included, those
concerning elections may stand, while those relating to ap-
pointments must fall, unless they are so dependent on each
other that the former cannot be executed without the latter.

3. So much of section 5 of the act approved April 5, 1896 (Sess.
Laws, p. 369, c. 125), as relates to elections, is valid; but the
provisions of said section which relate to filling vacancies in
certain offices by appointment are invalid, because in conflict
with section 23 of article 6 of the constitution. Likewise,
section 42 of the same act is void because in conflict with
section 23 of article 6 of the constitution.

4. The first term of district judges commenced in January, 1896,
and extends until January, 1901, and the plaintiff was ap-
pointed in June of the first-named year to fill a vacancy in
the office. *Held*, that his term expired upon the qualification
of his successor, elected in November, 1896, under a law pro-
viding therefor, passed in pursuance of section 10 of article
7 of the constitution, which declares that, if the office of dis-
trict judge becomes vacant, it shall be the duty of the gov-
ernor to fill the same, and the appointee shall hold until his
successor shall be duly elected and qualified as may be pro-
vided by law.

5. A law providing that electors may vote for all the candidates of a party by making a cross opposite a party emblem, and requiring those who do not vote for all such candidates to make a cross opposite the name of those voted for, and requiring those who have not been nominated by a party to present a petition to an officer mentioned, signed by a number of electors, in order to have their names printed on the ticket, *held* to be valid.

6. The limitations and restrictions contained in article 6, §§ 14, 22, 24, and in section 8, art. 7, of the constitution of this state, respecting the enactment of laws, are mandatory and binding upon the legislature. The mandatory provisions of the constitution are conclusive upon all departments of government. Per BARTCH, J. MINER, J., concurring.

7. The courts have power to declare any act of the government, in any of the departments, which violates the constitution, to be utterly void; and, in exercising this function in regard to an act of the legislature, they do not trench upon the domain of the legislative department. Per BARTCH, J. MINER, J., concurring.

8. When the validity of a statute is questioned in a court of law the enrolled act of the legislature, duly signed, approved, and deposited with the proper custodian, is *prima facie*, but not conclusive, evidence of its constitutional enactment, and of what the law is. Per BARTCH, J. MINER, J., concurring.

9. Courts take judicial notice of legislative journals required to be kept by the constitution. Such journals possess the character of public records, and the entries therein contained constitute evidence which courts may consider in determining the question of the constitutional enactment of a statute. Per BARTCH, J. MINER, J., concurring.

10. Where it affirmatively appears upon the legislative journals, or either of them, that in passing an act the legislature disregarded a mandatory provision of the constitution, the court is justified in holding the act unconstitutional and void; but, where journals are merely silent as to the subject-matter under investigation, the court will presume that the legislature acted in accordance with its delegated power, and will hold the act valid, unless an omission of some matter which the constitution expressly requires to be entered thereon be

shown by such journals, or either of them. Per BARTCH, J. MINER, J., concurring. ZANE, C. J., did not concur in holding that a law duly signed by the presiding officers of the respective houses, approved and signed by the governor, and filed in the office of the secretary of state, is not conclusive evidence of its passage, under a constitution which does not require the yeas and nays to be entered on the journals.

11. No legal voter in this state can be compelled to disclose for whom he voted, or to have his ballot so marked that it may be ascertained therefrom how he voted; and any contrivance or method by which the ballot can be identified, and the voter exposed, is unauthorized, and no legislative enactment can give it the force of law. Per BARTCH, J. MINER, J., concurring.

12. So much of section 26 of the act approved March 28, 1896 (Sess. Laws, p. 183), entitled "An act in relation to elections," etc., as provides for the identification of the ballot by numbering it, is void; such provision being in conflict with section 8, art. 4, of the constitution, which provides that "all elections shall be by secret ballot," etc. Per BARTCH, J. MINER, J., concurring. ZANE, C. J. dissenting.

13. The constitution secures to the voter impenetrable secrecy. Per BARTCH, J. MINER, J., concurring. ZANE, C. J., *held* legal secrecy sufficient.

(No. 764. Decided Dec. 21, 1896.)

Application by Morris L. Ritchie against Morgan Richards, state auditor, James Chipman, state treasurer, and A. C. Bishop, attorney general, as the board of state canvassers, for a writ of prohibition. *Denied.*

*Arthur Brown, C. F. Loofbourow, John M. Zane,* and *C. O. Whittemore,* for petitioner.

The journals must show, in order to support the integrity of any act, that all the necessary constitutional steps were taken in its passage. Cooley's Const. Lim., 506-7; McCreary on Elections, 304; *Ryan. v. Lynch,* 68 Ill. 162;

*Spengler* v. *Jacobs,* 14 Ill. 298; *People* v. *Storm,* 35 Ill. 121; *Will* v. *Kempfield,* 54 Cal. 112; *Illinois Central R. R. Co.* v. *People,* 143 Ill. 434; *Railroad Tax Case,* 8 Sawyer 293-5; *Post* v. *Supervisors,* 105 U. S. 667; *City of Ottawa* v. *Perkins,* 94 U. S. 261.

On the subject of a marked ballot not being a secret ballot we refer to the following authorities: *Brisbin* v. *Cleary,* 26 Minn. 106; *People* v. *Pease,* 27 N. Y. 45; *Williams* v. *Stein,* 38 Ind. 89; *State* v. *Hillmantel,* 23 Wis. 422; *Pennington* v. *Hall,* 62 N. W. 116; *Curran* v. *Clayton,* 29 Atlantic 932; *Parvin* v. *Windberg,* 30 N. E. 791; *People* v. *Com. Onodego County,* 29 N. E. 327; *Nichols Case,* 129 N. Y. 395; Cooley Const. Lim., 6th Ed., 760; *Tebbe* v. *Smith,* 108 Cal. 110; *Major* v. *Barker,* 35 S. W. 543; McCreary on Elections, 304; *State* v. *Wray,* 109 Mo.

*W. H. Dickson, H. P. Henderson, J. W. Judd,* and *R. B. Shepard,* for respondents.

ZANE, C. J.:

The plaintiff is one of the judges of the Third judicial district of the state of Utah, appointed by the governor on June 1st to fill the vacancy caused by the resignation of Judge Le Grand Young, whose term of office extended to the first Monday of January, 1901. In pursuance of an act entitled "An act relating to and making sundry provisions concerning elections," in force April 5, 1896 (Sess. Laws Utah 1896, p. 369), and of an act in relation to elections, defining offenses against the same, and prescribing punishments therefor, in force March 28 (Id. p. 183), a general election was held on the 3d day of November of that year, at which a person was elected to fill the vacancy so held by the plaintiff. The plaintiff asks the court to issue a writ prohibiting the defendants from canvassing the returns of the election of his successor, held

and conducted according to those laws. The plaintiff insists that they are void, and that, therefore, the writ should issue. The journals of the legislature do not expressly show how the votes were taken on the final passage of the bills, but the plaintiff claims that the entries authorize the inference that they were *viva voce*. The fact is entered upon the journals of the respective houses that the presiding officer of each house over which he presided signed both bills.

It is conceded that the bills were properly enrolled, signed by the presiding officer of each house, and approved and signed by the governor, and duly filed in the office of the secretary of state. The defendants insist that these bills, so authenticated, should be deemed complete and unimpeachable; that such authentication furnishes conclusive evidence that the legislature complied with all requisite constitutional provisions in their enactment, and that they were duly enrolled, signed, approved, and deposited in the public archives.

Section 14 of article 6 of the state constitution declares that "each house shall keep a journal of its proceedings, which, except in cases of executive sessions, shall be published, and the yeas and nays on any question, at the request of five members of such house, shall be entered upon the journal." This section requires the yeas and nays upon any question to be entered on the journals upon the request of five members. If such entry had been required for evidence of the passage of the bill, it would not have been made to depend on a request. The purpose of this entry appears to be for future reference and publicity, that the members may act under a consciousness of their responsibility to their constituents and to the public. Section 22 of the same article provides: "The enacting clause of every law shall be: Be it enacted by the legislature of the state of Utah, and no bill or joint

resolution shall be passed, except with the assent of a majority of all the members elected to each house of the legislature, and after it has been read three times. The vote upon the final passage of all bills shall be by yeas and nays; and no law shall be revised or amended by reference to its title only; but the act as revised, or section as amended, shall be re-enacted and published at length." This section prescribes the enacting clause of every law, and requires the assent of a majority of all the members elected to each house thereto after it has been read three times, and a vote by yeas and nays upon its final passage; and forbids the revision of any law by reference to its title, but requires the act revised, or section as amended, to be enacted and published at length. This section does not expressly require the yeas and nays to be entered on the journals, nor does it say by what means the acts specified shall be evidenced. Section 24 of the same article declares: "The presiding officer of each house in the presence of the house over which he presides shall sign all bills and joint resolutions passed by the legislature, after their titles have been publicly read, immediately before signing, and the fact of such signing shall be entered upon the journal." This section requires the title of each bill passed to be publicly read in the presence of each house, and the bill to be then signed, and the fact of signing to be entered on the journals. Section 8 of article 7 of the same instrument so far as necessary to quote it, is: "Every bill passed by the legislature before it becomes a law, shall be presented to the governor; if he approve, he shall sign it, and thereupon it shall become a law." This provision, in effect, says that every bill passed by the legislature becomes a law upon being signed by the governor, but it does not say how the passage of a law shall be evidenced.

Constitutional provisions prescribing modes of enact-

ing laws should be observed. But whether the proof of such observance consists of the enrolled laws deposited in the office of the secretary of state, duly signed by the presiding officers of the respective houses, and with the approval and signature of the governor, or of the entries found on the journals of the respective houses, furnishes a question as to which the courts of last resort in the various states differ. Objections may be urged to either means of proof. Minutes and memoranda may not always be correctly transcribed upon the journals. And the minutes and memoranda are sometimes made amid circumstances calculated to confuse and distract the attention, and to divert it from the business in hand. Bills may sometimes be enrolled, and signed by presiding officers, and approved by the governor, that have never been duly passed. Either source is subject to possible error. Courts and lawyers will differ as to which is the surest and best source of information. However, when statutes are published people shape their actions and conduct with respect to them; they incur obligations, acquire rights, and discharge duties in reliance upon them. If such a law, in any instance, should turn out to be void, because some requirement of the constitution had not been observed in its passage, great injustice would be likely to follow. We must regard the enrolled bill, duly signed, approved, and deposited in the public archives, as a more accessible and convenient source of authentication, and, if referred to, less liable to overturn law, and quite as reliable as the journals of the two houses. The people ought not to be required to ransack such journals to ascertain whether laws have been duly passed, and they cannot be expected to do so. Nor should lawyers, before advising clients, be required to search such journals. Statutory enactments should not depend nor stand upon such a sandy and uncertain foundation, if a better

one can be found. Laws evidenced by the signatures of the presiding officers, and the approval and signature of the governor, and the filing in the public archives, ought not to be overthrown by memoranda on the journals which the constitution does not require to be made.

We are of the opinion that the enrolled bill, duly signed, approved, and deposited in the office of the secretary of state, is quite as reliable, and more accessible and convenient than the entries, or the absence of entries, of legislative action shown by the journals of the two houses, and, if relied upon as unimpeachable, will be less liable to overturn laws upon which the people have relied, and under which they have acquired rights, incurred obligations, and performed duties,—less liable in that way to cause litigation and confusion. The question involves consideration of public policy. In *Lafferty* v. *Huffman* (a late case decided by the Kentucky court of appeals), 35 S. W. 123, the objection to the law was "that on the final passage in the senate of the bill, as amended in the other house, the vote was not taken by yeas and nays." After a thorough examination of the question, similar to the one now under consideration, the court said: "From every point of reason, therefore, we are convinced that the enrolled bill, when attested by the presiding officers as the law requires, must be accepted by the courts as the very bill adopted by the legislature, and that its mode of enactment was in conformity to all the constitutional requirements. When so authenticated, it imports absolute verity, and is unimpeached by the journals. When we look to the authorities, we find, as indicated before, a great diversity of opinion. They are too numerous to be reviewed here. We notice, however, that the more recent cases are adopting the English rule, and holding the enrolled bill conclusive. In several of the cases, where the courts felt constrained to follow their

former rulings, holding the journals competent, regret
is expressed that a different rule had not prevailed."
*Warren* v. *Board* (Mich.), 40 N. W. 553; *State* v. *Young*,
32 N. J. Law 29; *Sherman* v. *Story*, 30 Cal. 253; *State* v.
*Swift*, 10 Nev. 176.

In *Field* v. *Clark*, 143 U. S. 649, 495, the court, after
stating that it was not necesasry to decide in that case
to what extent the validity of legislative. acts may be
affected by the failure to enter on the journals matters
which the constitution expressly requires to be entered,
used the following language: "The signing by the
speaker of the house of representatives, and by the presi-
dent of the senate, in open session, of an enrolled bill,
is an official attestation by the two houses of such bill
as one that passed congress. It is a declaration by the
two houses, through their presiding officers, to the presi-
dent, that a bill thus attested has received, in due form,
the sanction of the legislative branch of the government,
and that it is delivered to him in obedience to the consti-
tutional requirement that all bills which pass congress
shall be presented to him. And when a bill thus attested
receives his approval, and is deposited in the public
archives, its authentication as a bill that has passed con-
gress should be deemed complete and unimpeachable."
*Harwood* v. *Wentworth*, 162 U. S. 547. The constitutions
of many of the states expressly require the yeas and nays
on the passage of a bill, as well as other matters, to be
entered on the journals, while the constitutions of other
states do not expressly require such entries. The de-
cisions holding that the court may look beyond the en-
rolled bill in the public archives, duly signed and ap-
proved, in nearly every instance, were made in states
whose constitutions expressly require such entries upon
the journals, while the decisions, with some exceptions,

14 UTAH—23

holding the law, duly signed and approved, in the public archives, as unimpeachable, were made under constitutions not requiring such entries. There are, however, well-considered cases that hold such laws, so deposited, signed, and approved, as conclusively authenticated, though constitutional provisions expressly require such entries to be made on the journals. It is not necessary for us to go that far in this case, as our constitution does not expressly require such entries to be made, except when demanded by five members; and that entry, we have seen, is mainly for the purpose of publication. English statutes found in the proper custody, duly authenticated, import absolute verity. Such has been the common law of England from early times. The statutes in question having been duly signed, approved and deposited in the office of the secretary of state, we must conclusively presume that all constitutional requisites were complied with in their enactment.

It is also claimed that section 26 of the act in force March 28, 1896, *supra*, is void because it conflicts with section 8 of article 4 of the state constitution, which reads: "All elections shall be by secret ballot. Nothing in this section shall be construed to prevent the use of any machine or mechanical contrivance for the purpose of receiving and registering the votes cast at any election: Provided, That secrecy in voting be preserved." It is conceded that this section requires a secret ballot, but defendants claim that the statute provides for a secret ballot. The portion of section 26 objected to is as follows: "The judge or clerk shall immediately write the name of such voter upon the poll list, and shall take the ballot of such voter and number it in ink in one corner upon the top thereof, in such manner as not to expose or show how the voter

has voted. The same to be numbered in the order in which it shall be received consecutively, and so as to permit the corner to be turned and pasted down with mucilage, which shall then be done so that the number is not thereafter visible, and such seal shall only be broken in case of a contested election; and the same number shall be recorded by the election judge or clerk on the list of voters beside the name of such voter." Without a violation of law, no one can ascertain from this numbering for whom any citizen has voted, without a contest, and then the court or tribunal before whom the contest is conducted should only allow tickets cast by persons who are not legal voters to be examined, and persons casting such votes cannot insist upon secrecy. If a person succeeds in getting an illegal ticket into the box, it cannot be thrown out without identification; and without the number, or some other character or mark, upon the ticket, it cannot be identified. When the name of a person who has cast an illegal ticket is ascertained, and the number is learned from the poll list, some authorized person must open the box and break the seals until the right number is found; but, until that one is reached, such person has no right to examine the names on any ticket. The number being on the corner, it would not be necessary, nor would it be lawful, for him to examine the names on any lawful ticket. If it should become necessary to count the tickets in the box, it would not be proper to break the seals and examine the numbers for that purpose. It is clear that an examination necessary to a contest cannot disclose for whom any persons, except fraudulent voters, have voted, without a violation of the spirit of the law. We cannot presume that the authors of the constitution intended to prevent election contests,—to prevent any proceeding by which ballots cast by illegal vot-

ers can be thrown out. The method devised by this law preserves legal secrecy. The members of the convention must have known that election contests were permitted in all the states, and that they are deemed necessary wherever the people express their will at the polls. Justice should be permitted to pursue fraud, even into the ballot box. No man should be allowed to hold an office obtained by corrupt or illegal votes. To prevent it, a numbering of ballots is necessary in some cases. It is sanctioned by authority. *Hodges* v. *Linn*, 100 Ill. 397; *Ledbetter* v. *Hall*, 62 Mo. 422; *West* v. *Ross*, 53 Mo. 350. While we are of the opinion that a law might be framed, permitting an election contest, and better adapted to secure a secret ballot, we are disposed to hold the present law valid notwithstanding this objection.

The plaintiff insists further that the subject of the act in force April 5th, *supra*, is not clearly expressed in its title, and that it contains more than one subject, and that it does not conform to section 23 of article 6 of the constitution, which declares that, "except general appropriation bills, and bills for the codification and general revision of laws, no bill shall pass containing more than one subject, which shall be clearly expressed in its title." Undoubtedly this provision requires the subjects of all bills not within the exceptions to be clearly expressed in their titles, and the title limited to one subject. Such limitations were not imposed formerly on legislation, but observation and experience have demonstrated a necessity for their application. It is believed that such restrictions tend to prevent hasty, inconsiderate, improvident, and sometimes corrupt legislation, to the detriment of the common good. The object may be a general one, however, and it may be stated in terms sufficiently comprehensive to embrace every means and end necessary or

convenient for the accomplishment of the general purpose. Their purpose is not fragmentary legislation, however, nor will they permit subjects to be included not connected with the general purpose,—not necessary or convenient as a means to the general end. The title of the act in question is expressed as follows: "An act relating to and making sundry provisions concerning elections." The title, as expressed, indicates provisions relating to or concerning elections. It states a general purpose. It asserts that the entire act relates to elections, and that it contains sundry provisions concerning elections. In that way the title describes the act, and the provisions it contains. The elections which the act concerns, and for which it professes to make provision, are described in general terms, broad enough to include all elections, special and general elections to fill offices for the term, or to fill a vacancy. Thus the subject is expressed, and we think it is expressed with sufficient clearness. Cooley, Const. Lim. pp. 170, 172; *People* v. *Mahaney*, 13 Mich. 481; *Tuttle* v. *Strout*, 7 Minn. 465 ( Gill. 374).

This brings us to the further question, is the act what the title says it is, and do its provisions concern elections? Two of its sections we will consider with respect to the title: Section 5 is as follows: "If a vacancy occurs in the office of judge of the supreme or district court, secretary of state, state auditor, state treasurer, attorney general or superintendent of public instruction, the governor shall appoint a person to hold the office until the election and qualification of a successor to fill the vacancy, which election shall take place at the next succeeding general election, and the person so elected shall hold the office for the remainder of the unexpired term." In case of a vacancy in either of the offices mentioned, this section makes provision for filling it by election at the next suc-

ceeding general election, and requires the governor to appoint a person to hold it until that time. The provision for the election of a person to fill the vacancy is indicated by the title of the act, but the provision for appointing an incumbent in the meantime is not. The general purpose described in the title includes the election, but does not include the appointment. The provision for the election is valid unless it conflicts with section 10 of article 7 of the constitution. This provision for an election will be considered with respect to said section 10 further on. But the power to appoint a person to hold the office is conferred on the governor by section 10 of the constitution mentioned, and the invalidity of the provision for such appointment, because it is not embraced in the title of the act, is immaterial. It also appears in section 42 of the act under discussion that "all appointive officers in said cities and towns shall hold their respective offices until their successors shall be appointed and qualified." This section does not relate to elections, nor does it concern elections. Therefore the title does not embrace it. The other provisions of the act appear to relate to elections, and are therefore valid, so far as they depend on the title, and they are not affected by those held to be void. If the act is broader than the title, the rule is that the provisions indicated by the title may stand, while those not indicated must fall, unless they are so dependent on each other that they cannot be executed separately. Cooley, Const. Lim. (6th Ed.) p. 177.

As we have seen, this is the first term of office of district judges under the constitution, and that the term extends to the first Monday in January, 1901, and that plaintiff was appointed in May last to succeed Judge Young, who had resigned; and a further question in this case is, can he hold until the end of the term, on the first

Monday of January, 1901, or until the qualification of the
person who was elected in pursuance of section 5, *supra*,
on the 3d day of November last? If that section governs,
his successor was duly elected as provided by law, and
upon his qualification the petitioner's right to the office
will be at once terminated. Whether it shall govern de-
pends upon the meaning of section 10 of article 7 of the
constitution. That section reads as follows: "The gov-
ernor shall nominate and, by and with the consent of the
senate, appoint all state and district officers, whose offi-
ces are established by this constitution, or which may be
created by law, and whose appointment or election is not
otherwise provided for. If, during the recess of the sen-
ate, a vacancy occur in any state or district office, the
governor shall appoint some fit person to discharge the
duties thereof until the next meeting of the senate, when
he shall nominate some person to fill such office. If the
office of justice of the supreme court or district court,
secretary of state, state auditor, state treasurer, attorney
general or superintendent of public instruction be va-
cated by death, resignation or otherwise, it shall be the
duty of the governor to fill the same by appointment, and
the appointee shall hold his office until his successor shall
be elected and qualified as may be by law provided."
This section is composed of three distinct clauses or pro-
visions. The first makes it the duty of the governor to
nominate, and, with the consent of the senate, appoint,
all state and district officers whose offices are established
by the constitution, or which may be created by law, and
whose appointment or election is not otherwise provided
for. If a vacancy occurs in any state or district office dur-
ing the recess of the senate, the second clause requires the
governor to appoint a fit person to discharge the duties
of the office until the next meeting of the senate, and

then it requires him to nominate a person to fill the office. If the office of justice of the supreme or district court, secretary of state, state auditor, state treasurer, attorney, general, or superintendent of public instruction becomes vacant, the third and last clause of the section makes it the duty of the governor to fill the same by appointment, and provides that such appointee shall hold the office until his successor shall be elected and qualified as provided by law. Doubtless a legislative enactment was contemplated. In the absence of such a law, there would be great force in the claim that such appointee would hold until the general election to fill the office in 1901, and until the qualification of such person, or a successor after that time. But so much of section 5 of the act of April 5th, above quoted, as relates to elections, we hold to be valid, and it must be held to govern.

The plaintiff also insists that ballots prepared and printed according to the act of March 28th, above mentioned, and exclusively used at the November election, do not afford equal facilities to vote to all voters; that a ballot may be cast for party candidates with less difficulty than for those candidates who have no emblem on the ballot to represent them; that a partisan can vote easier than an independent; and that the law does not operate equally and uniformly on all voters. It is true that party organizations may, by the observance of certain requirements, have the names of their candidates and their emblem printed on the ticket, while other candidates are required to obtain the signatures of a specified number of voters to a certificate before their name can be printed on the ballot. And by simply placing a cross opposite a party emblem a vote may be cast for all the candidates of a party, while a vote for any number of candidates of a party less than all can only be given by a

cross opposite the name of each candidate; and if a voter wishes to cast a vote for a candidate whose name is not on it, he is obliged to write the name on the ballot, and place a cross opposite to it. Of course the voter should be allowed to perform this duty with the least difficulty and inconvenience consistent with an honest and fair election. No unnecessary impediments or inconveniences should be thrown in his way. The system tends to encourage the voting of straight tickets, and to discourage. independent voting, which some think is an objection. The system has its merits as well as its demerits, and the legislative department of the state government has seen fit, in its wisdom, to enact the law; and we do not feel authorized to overturn the people's will, as expressed through that body, in the law. The court holds that none of the various objections urged by the plaintiff is well founded. We therefore deny the application for the writ.

BARTCH, J.:

I concur in the result that the application for the writ must be denied. But I do not concur in the proposition, which appears to be maintained in the opinion, that when an enrolled act of the legislature is duly signed, approved, and deposited in the office of the secretary of state, this court must conclusively presume that all constitutional requisites were complied with in its enactment. This, it occurs to me, is extending the rule further than is warranted by the decisions of the courts of the United States, or by the welfare of this state, or by the will of the people, as announced in the constitution. Carried to its legitimate effect, this proposition means that when an enrolled act has been properly signed, approved, and deposited with the secretary of state, it is the law of this commonwealth, even though, in its enactment, express limita-

tions of the constitution have been violated, and that when drawn in question the judges who are called upon to determine its validity have no power to go beyond the enrolled act, and look into the journals of the legislature, required to be kept by the constitution, to satisfy the judicial mind of its constitutional passage. This would place the legislature, in the mode of the enactment of laws, beyond the control of the sovereignty itself, and the limitations contained in the constitution respecting the manner of enacting laws would be mere useless verbiage. With all due respect to that co-ordinate branch of the government, I cannot consent to a proposition that would invest it with a power so arbitrary. Because such a rule obtains as to the parliament of Great Britain, under a monarchial form of government, that cannot be regarded as a very potent reason for its application in this state, where the will of the sovereign power has been declared in the organic law. The people, in their sovereign capacity, after great deliberation, adopted a constitution, and established a government consisting of an executive, a legislative, and a judicial department. That constitution is their supreme will, which must be obeyed by every individual, be he of high station or of low. Those composing the several departments are but agents, and in their acts are bound by the organic law; and the limitations and restrictions contained therein are not mere abstract principles, but solemn declarations by the people themselves. They are as conclusive upon such agents as any other portion of the written charter. Limitations are not peculiar to any one branch of the government, but there are those which apply to each department, and they are imposed as a security to the rights of the principal,—the people. The power of the government is vested in the three departments, to be

exercised subject to these limitations. The power to declare what the law shall be is legislative. The power to declare what is the law is judicial. The power to declare what is the law is delegated to the judicial department, and therefore the courts have the unquestioned right to declare any act of the government, in any of the departments, which violates the constitution, to be utterly void. This right or power necessarily includes the power to declare what enactments of the legislature are, and what are not, laws; and in exercising this function the courts do not trench upon the domain of the legislative department, although they pass judgment upon its official acts. When the enrolled act is assailed in a court of law on the ground that it was not constitutionally passed by the legislature, the court must determine whether there was a compliance or noncompliance with the mandatory provisions of the constitution respecting the mode and manner of the passing of the act. For this purpose, I have no doubt that, upon principle, as well as authority, the court may take judicial notice of the legislative journals, and, in a proper case, go behind the enrolled act, even when such act has been properly authenticated and deposited with the secretary of state, and examine such journals, giving their contents such weight as evidence as they may be entitled to receive, considering the manner in which they are kept, and circumstances under which the entries have been made; and if, in such case, it should affirmatively appear upon the journals, or either of them, that in passing the act the legislature had disregarded a mandatory provision of the constitution, the court would be justified in holding the same unconstitutional and void. If, however, the journals are merely silent as to the subject under investigation, then the presumption that the legislature acted according

to its delegated power should prevail, unless an omission of some matter which the constitution expressly requires to be entered therein be shown by such journals, or either of them. It seems that even the English rule admits the journals of parliament to be evidence for such purposes as they are there considered to be provided, but they cannot there be referred to for the purpose of impeaching the enrolled act. I am therefore of the opinion that in this country the enrolled act of the legislature, duly signed, approved, and deposited with the proper custodian, is *prima facie*, but not conclusive, evidence of its constitutional enactment and of what the law is; that the courts may take judicial notice of the legislative journals required to be kept by the constitution; and that such journals possess the character of public records, their value in each case being a question for the courts. In fact, some of counsel for respondents, in their oral arguments, admitted that the courts had the right to take judicial notice of the journals, but claimed that they contained nothing derogatory to the validity of the act, and in this I think they were correct. The journals of parliament to be evidence for such pur- evidently intended for the purpose of making a record of the daily proceedings of the legislature. They are, therefore, public records made in *perpetuam memoriam rei* entered therein, and where questions arise as to what is contained therein, or what proceedings were had, the court has the right to inspect the record. Such record is like any other public record, which, in the language of Sir Edward Coke, is " a monument of so high a nature, and importeth in itself such absolute verity, that, if it be pleaded that there is no such record, it shall not receive any trial by witness, jury, or otherwise, but only by itself." 3 Bl. Comm. 331.

When a similar proposition was before our late territorial supreme court, in *People* v. *Clayton*, 5 Utah 598, Chief Justice ZANE, then speaking for the court, observed: "Whenever such a question arises, the court, in deciding the issue, should take judicial notice of such facts as it may properly consider. The evidence of public laws should be preserved in public and permanent records,"— and, after reviewing a number of authorities, said: "In the light of authority, we are of the opinion  *  *  * that where the journals of the two houses, showing their action, are kept in pursuance of law, the court may look to such journals to ascertain whether the constitutional requirements have been complied with." Thus, the journals were at that time recognized as evidence by the court. Why should this case be overruled, and a different doctrine prevail now? It certainly cannot be successfully contended that the reasons for recognizing the journals as evidence then were stronger than now, because, in addition to the reasons which then existed, we have now the mandate of the constitution that "each house shall keep a journal of its proceedings." Article 6, § 14. Clearly, the affirmative of the question is supported by the weight of authority in the several states of the Union, as well as by eminent text writers. Judge Cooley, in his treatise on Constitutional Limitations, on page 162, says: "Each house keeps a journal of its proceedings, which is a public record, and of which the courts are at liberty to take judicial notice. If it should appear from these journals that any act did not receive the requisite majority, or that in respect to it the legislature did not follow any requirement of the constitution, or that in any other respect the act was not constitutionally adopted, the courts may act upon this evidence, and adjudge the statute void." Judge Sutherland, in his work

on Statutory Construction (section 46), states the law as
follows: "When an act is found lodged in the office of
the secretary of state, with the public acts passed at
the same session, signed by the presiding officers,
approved and signed by the governor, and it is published
by authority as one of the public statutes of the state,
or is otherwise authenticated according to law, and in
proper custody, the presumption is that it was regularly
passed, unless there is evidence of which the courts take
judicial notice showing the contrary. The journals are
records, and, in all respects touching proceedings under
the mandatory provision of the constitution, will be effec-
tual to impeach and avoid the acts recorded as laws, and
duly authenticated, if the journals affirmatively show
that these provisions have been disregarded. In the
absence of such an affirmative showing, and even in cases
of doubt, it will be presumed that a quorum was present;
that the necessary readings occurred; that amendments
made by one branch, though extensive, were germane;
that they were concurred in by the other branch,—though
the journals may be silent." And in section 42 he says:
"The tendency, however, of the law's growth, is to pre-
serve the supremacy of constitutional authority, leaving
it to the wisdom of the legislature to mitigate any inciden-
tal inconvenience by closer observance of the prescribed
procedure, and more diligent attention to the making and
preservation of a public record of the essentials. The
cases cited in the preceding section hold the constitu-
tional injunctions imperative, and, as the constitutions
require the keeping and publication of legislative
journals, these are treated as sources of information to be
relied on by the courts as well as the public." In section
44 he says: "The journals, by being required by the con-
stitution or laws, are records. At common law the legis-

lative journals were not strictly records. While admissible in evidence for certain purposes, as official memorials or remembrances they were not admissible to show that an act of parliament had not been passed according to its own rules. But when required, as is extensively the case in this country, by a paramount law, for the obvious purpose of showing how the mandatory provisions of that law have been followed in the methods and forms of legislation, they are thus made records in dignity, and are of great importance. The legislative acts regularly authenticated are also records. The acts passed, duly authenticated, and such journals are parallel records, but the latter are superior, when explicit and conflicting with the other; for the acts authenticated speak decisively only when the journals are silent, and not even then as to particulars required to be entered therein." See, also, section 41. So Black, in his late work on Interpretation of Laws (published in 1896) p. 225, after speaking of the right of referring to the journals of the legislature in aid of the interpretation of statutes, says: "It will be observed that this question is an entirely different matter from resorting to the legislative journals to ascertain whether an act was constitutionally passed; that is, passed with the requisite majority, or after the required number of readings, or with a call of the house on its final passage, or otherwise in conformity with the requirements of the constitution. On this point the rule settled by a majority of the courts is that it is competent to go behind the enrolled act, and consult the journals, but that the act will not be declared void for lack of compliance with the constitutional forms, unless their non-observance is shown affirmatively by the journals. If the journals are silent as to these matters, it will be presumed that the legislature complied with all the constitu-

tional requisites. In any event, no evidence can be received to contradict the journals."

In the state of New Hampshire, in 1858, an act was found lodged in the office of the secretary of state, with other public acts passed at the same session. It was signed by the speaker of the house of representatives and the president of the senate, and had upon it the approval of the governor, and had been published, by authority, as one of the public statutes enacted at that session. The validity of the act having been questioned, because in its enactment the legislature had failed to comply with a certain requirement of the constitution, the governor submitted the question of its validity to the supreme court of that state. In their opinion (35 N. H. 579), unanimously holding the act invalid, the court, upon the question whether they could look into the journals, said: " We are of opinion that the journals which the constitution thus requires to be kept by the senate and house of representatives, to be lodged and preserved in the general public depository of the state records, and to be published annually in the same manner as the public laws, were intended to furnish the courts and the public with the means of ascertaining what was actually done in and by each branch of the legislature, not merely for the purpose of enabling the people to judge of the manner in which their public servants have conducted themselves in their office of legislators, but also for the purpose of determining whether the proceedings of the legislature have been in conformity with the provisions of the constitution; that these journals, under our constitution, are not to be regarded as ' mere remembrances of proceedings,' kept by each house for its own use and convenience, which expire when the act is passed, or the business is disposed of, to which they relate. But we think they are to be

treated as authentic records of the proceedings, and that we may resort to them in this case to ascertain whether the two houses in fact concurred in the passage of the before-mentioned act; that, if it appears by the journals that they did not, the *prima facie* evidence derived from an examination of the act itself will be overcome." Mr. Justice Gray, in *Post* v. *Sup'rs*, 105 U. S. 667, said: "The copies of the journals, certified by the secretary of state, and the printed journals published in obedience to law, are both competent evidence of the proceedings in the legislature." In *Hall* v. *Steele*, 82 Ala. 562, Mr. Justice Clopton said: "We have uniformly held that, when the constitution does not require the journals to affirmatively show that a particular thing necessary to the validity of the legislative action was done, mere silence will not invalidate; and in such case we will presume that the legislators observed their obligation, and did not pass such bill without sufficient proof that the proper notice had been given. The unconstitutionality of an act enrolled, authenticated by the signatures of the presiding officers, and approved and signed by the governor, must be affirmatively and clearly shown, before the courts are authorized to treat it as void because not having been passed in accordance with the rules of parliamentary law prescribed in the constitution." So, in *Sup'rs* v. *Heenan*, 2 Minn. 330 (Gil. 281), Mr. Justice Flandrau stated: "The court may inspect the original bills on file with the secretary of state, and have recourse to the journals of the houses of the legislature, to ascertain whether or not the law has received all the constitutional sanctions to its validity."

In *Gardner* v. *Collector*, 6 Wall. 499 (Mr. Justice Miller delivering the opinion of the court), it was said: "We are

14 UTAH—24

of opinion, therefore, on principle as well as authority, that whenever a question arises in a court of law of the existence of a statute, or of the time when the statute took effect, or of the precise terms of a statute, the judges who are called upon to decide it have a right to resort to any source of information which, in its nature, is capable of conveying to the judicial mind a clear and satisfactory answer to such question,—always seeking first for that which, in its nature, is most appropriate,—unless the positive law has enacted a different rule." In the case of *People* v. *Mahaney*, 13 Mich. 481, the supreme court of Michigan, speaking through Mr. Justice Cooley, said: "As the court are bound judicially to take notice of what the law is, we have no doubt it is our right, as well as our duty, to take notice, not only of the printed statute books, but also of the journals of the two houses, to enable us to determine whether all the constitutional requisites to the validity of a statute have been complied with. The printed statute is not even *prima facie* valid, when other records, of which the court must equally take notice, show that some constitutional formality is wanting." The supreme court of Illinois, in *Illinois Cent. R. Co.* v. *People*, 148 Ill. 434, said: "It is not denied that the amendatory act received the signatures of the speakers of both houses, and the approval of the governor. Such verification is *prima facie* evidence of its validity as a legislative enactment. But it is the settled law of this state that the journals of either branch of the legislature may be resorted to for the purpose of overcoming such *prima facie* evidence. It may be shown from the journals that an act was not passed in the mode prescribed by the constitution." So the supreme court of Florida, in *State*

v. *Brown,* 20 Fla. 407, says: " If the journals show con-
clusively that any material portion of a bill, as passed,
was omitted in the enrolling, so that it may be considered
that the act, as approved, was not passed by the legisla-
ture, and does not express the legislative will, the act,
as approved, at least to the extent that it is affected by
the omission, must be held invalid. This is a rule well
settled now by the American courts. The constitution
requires the keeping of journals of their proceedings by
the respective houses of the legislature, and these
journals are received as evidence of such proceedings.
When an act is duly approved and published, it is *prima
facie* a law; but if the legislative journals show that,
instead of being passed, it was defeated, or that it is not
the same that was passed, it is not a law." Sedg. St. &
Const. Law (2d Ed.) §§ 54, 55; Black, Const. Law, 60, 265;
End. Interp. St. § 33; 1 Whart. Ev. §§ 290-295; 1 Greenl.
Ev. § 491; 2 Whart. Ev. § 1309. *Henderson* v. *State,* 94
Ala. 95; *State* v. *Wright,* 14 Or. 365; *Chicot Co.* v. *Davies,* 40
Ark. 200; *Spangler* v. *Jacoby,* 14 Ill. 397; *Currie* v. *Southern
Pac. Co.,* 21 Or. 560; *State* v. *Robinson,* 20 Neb. 96; *Osburn*
v. *Staley,* 5 W. Va. 85; *In re Roberts,* 5 Colo. 525; *Hart* v.
*McElroy,* 72 Mich. 446; *State* v. *Hagood,* 13 S. C. 46; *Com'rs*
v. *Higginbotham,* 17 Kan. 62; *Koehler* v. *Hill,* 60 Iowa 542;
*Wise* v. *Bigger,* 79 Va. 269; *Paving Co.* v. *Hilton,* 69 Cal.
479; *People* v. *Dunn,* 80 Cal. 211; *Glidewell* v. *Martin,* 51
Ark. 559; *State* v. *Robertson,* 41 Kan. 390; *State* v. *Van
Duyn,* 24 Neb. 586; *State* v. *Kiesewetter,* 45 Ohio St. 254;
*Berry* v. *Railroad Co.,* 41 Md. 446; *State* v. *Algood,* 87 Tenn.
163; *State* v. *Platt,* 2 S. C. 150; *Brown* v. *Nash,* 1 Wyo. 85;
*People* v. *Campbell,* 3 Gilm. 466; *State* v. *McBride,* 4 Mo.
302; *State* v. *Mead,* 71 Mo. 266; *Southwark Bank* v. *Com.,*
26 Pa. St. 446; *City of Watertown* v. *Cady,* 20 Wis. 501;
*State* v. *Babbitts,* 46 Ohio St. 173; *People* v. *Clayton,* 5 Utah
598; *Meracle* v. *Down,* 64 Wis. 323; *Territory* v. *O' Connor,*

5 Dak. 397; *Hughes* v. *Felton*, 11 Colo. 489; *San Mateo Co.* v. *Southern Pac. R. Co.*, 8 Sawy. 238; *State* v. *Deal*, 24 Fla. 293; *People* v. *Burch*, 84 Mich. 408; *Burritt* v. *Com'rs*, 120 Ill. 222, *Nelson* v. *Haywood Co.*, 91 Tenn. 596.

The above constitutes but a small portion of the cases which support the views herein contended for. They are sufficient, however, to show that over 20 states have held that the journals of the houses of the legislature may be looked to in deciding the constitutionality of an enrolled act. 23 Am. & Eng. Enc. Law, 208. Seven states appear to have no decisions on the subject. Connecticut, Indiana, Kentucky, Louisiana, Maine, Nevada, and Mississippi have decided that the enrolled act is conclusive, and in several other states the decisions do not appear to be uniform. *Field* v. *Clark*, 143 U. S. 649, 661, and note. It will be noticed, from an examination of the cases which hold the affirmative of this proposition, that the decisions, in the main, are not based on any peculiar constitutional provision, but on principle, and the ground that the constitution requires the journals to be kept.

It is quite clear that under the American rule, adopted by a large majority of the states of the Union, the legislative journals may be consulted to determine whether the enrolled act was constitutionally passed; and this has also the support of the text writers. That to hold a statute void may work a hardship upon people is quite true, but that fact has no more force when the law is held void because of the violation of a mandatory provision of the constitution than when it is held void for any other reason. It is the solemn duty of courts to declare what the law is, regardless of consequences. In this case, looking to the journals, there appear to be no affirmative statements recorded which conflict with the validity of the enrolled act; and the mere silence of the journals as to the mandatory provision of the constitution here in

question will not justify the holding of the act void, because the presumption in such case that the legislature proceeded properly is conclusive.

I am also unable to agree with the Chief Justice in his views as to a secret ballot. The constitutional provision on this question (article 4, § 8) is as follows: "All elections shall be by secret ballot. Nothing in this section shall be construed to prevent the use of any machine or mechanical contrivance for the purpose of receiving and registering the votes cast at any election: provided, that secrecy in voting be preserved." This is an express provision for a secret ballot, and clearly the word "secret" should, in the interpretation of this section, receive its plain and ordinary meaning, because it does not appear from the context that any other meaning was intended by the framers of the constitution. In fact, the words "secret ballot" appear to be emphasized; for, while the use of a machine or mechanical contrivance is permitted for a certain purpose, it is only permitted "provided, that secrecy in voting be preserved." Used as an adjective, Webster defines the word "secret" as "hidden; concealed." As a noun, "something studiously concealed; a thing kept from general knowledge; what is not revealed, or not to be revealed." Doubtless this latter is the sense in which the words "secret ballot" were used in the constitution. This view is in harmony with public thought and expression respecting the ballot systems at the time of and before the holding of the constitutional convention, and the courts have the right to take notice of the history of the times, for the purpose of ascertaining the intent of the framers of the constitution. It is well understood that the questions of open and secret ballots created much discussion in the several states, as well as in Utah territory, on account of the improper influence,

whether supposed or real, which could be brought to bear upon the humble citizens by their employers, or those to whom they felt under obligations, or which might result from wealth and station. The secret ballot is a question of public policy, and the framers of the constitution doubtless intended to make the veil of secrecy impenetrable, so that the voter could make promises to whom he pleased, and vote as he pleased, without fear of afterwards having the secrecy of his ballot violated. The object to secure an independent ballot would be very imperfectly accomplished if the secrecy was limited to the moment of casting the ballot. It is apprehended that it is not so much the fear of the voter of being exposed then, as the fear of afterwards having his ballot identified and becoming exposed, whether clandestinely or otherwise, that deprives him of independence. Beyond all reasonable controversy, the object aimed at by this provision of the constitution was to secure the independence of the voter. How, then, can this object be attained, if the voter be compelled to cast a ballot which can be identified? To my mind, the conclusion is inevitable that any contrivance or method by which the ballot can be identified and the voter exposed is unauthorized, and no legislative enactment can give it the force of law, under our constitution, be the same for the purpose of contest in a court of justice, or for any other purpose. In arriving at this conclusion, I am not unmindful of the grave duty of the sovereign power to protect individual rights by suppressing election frauds. Such frauds shock the conscience of every true American citizen. But is it not possible to perpetrate the gravest kind of such frauds by the intimidation of the independent voter? Remove the safeguards, and will it not be possible to commit frauds at elections which will strike at the very foundation of gov-

ernment itself? Then why annul a wise provision of the constitution by judicial construction, and render it possible to perpetrate the very offenses which all good citizens condemn? From the time of placing a number on the ballot, as provided by the section of the act in question, which renders it susceptible of identification, its secret character is gone, whether the court pronounces it a legal secret ballot or not. The fact is that such a ballot is not secret, within the meaning and intent of the constitution. Whether the method provided by the legislature is the best or only method which can be of avail in an election contest does not concern this court. It might be suggested, however, that election contests occupied the attention of courts before such a ballot was invented, and considerations of convenience in election contests can have no influence with the court in determining the question under consideration. A legal voter, even in a contest, cannot be compelled to disclose his ballot. Much less should he be compelled to vote one from which it may be ascertained by others, or even a court, how he voted. And this upon consideration of public policy that the secrecy and purity of the ballot may be preserved.

In Cooley, Const. Lim. (5th Ed.) 762, the author says: " The system of ballot voting rests upon the idea that every elector is to be entirely at liberty to vote for whom he pleases, and with what party he pleases, and that no one is to have the right, or be in position, to question his independent action, either then or at any subsequent time. The courts have held that a voter, even in case of a contested election, cannot be compelled to disclose for whom he voted; and for the same reason we think others, who may accidentally, or by trick or artifice, have acquired knowledge on the subject, should not be allowed to testify to such knowledge, or to give any information

in the courts upon the subject. Public policy requires that the veil of secrecy should be impenetrable, unless the voter himself voluntarily determines to lift it. His ballot is absolutely privileged, and to allow evidence of its contents, when he has not waived the privilege, is to encourage trickery and fraud, and would, in effect, establish this remarkable anomaly, that while the law, from motives of public policy, establishes the secret ballot with a view to conceal the elector's action, it at the same time encourages a system of espionage, by means of which the veil of secrecy may be penetrated, and the voter's action disclosed to the public." So in McCrary, Elect. § 453, it is said: "The secret ballot is justly regarded as an important and valuable safeguard for the protection of the voter, and particularly the humble citizen, against the influence which wealth and station may be supposed to exercise. And it is for this reason that the privacy is held not to be limited to the moment of depositing the ballot, but is sacredly guarded by the law for all time, unless the voter himself shall voluntarily divulge it." In Paine, Elect. § 453, the author states the law as follows: "A constitutional provision that all elections shall be held by ballot guarantees the secrecy of the ballot, and is violated by a statute requiring the tickets to be numbered to correspond with the voters' numbers on the poll list." In the case of *People* v. *Cicott*, 16 Mich. 283, Mr. Justice Campbell said: "The reason why the ballot is made obligatory by our constitution is to secure every one the right of preventing any one else from knowing how he voted, and there is no propriety in any rule which renders such a safeguard valueless." And again he says: "It would be better to do away at once with the whole ballot than to have legal tribunals give any aid or countenance to indirect violations of its security." So the

supreme court of Minnesota, in *Brisbin* v. *Cleary*, 26 Minn. 107, speaking through Mr. Justice Berry, said: "The statutory provision with regard to the numbering of tickets, above quoted, clearly interferes with and violates the voter's constitutional privilege of secrecy. The voter cannot be required to submit to its application the ticket offered by him, and if, upon refusing to so submit, he is debarred from voting, he may maintain his action for damages against the persons debarring him." The constitution of Indiana (article 2, § 13) containing a provision that "all elections shall be by ballot," a statute was enacted which provided as follows: "It shall be the duty of the inspector of any election held in this state, on receiving the ballot of a voter, to have the same numbered with figures on the outside or back thereof, to correspond with the number placed opposite the name of such voter on the poll list kept by the clerks of said election." 3 Rev. St. Ind. 1870, p. 235. The supreme court of that state, in *Williams* v. *Stein*, 38 Ind. 89, held that the ballot secured by the constitution was a secret ballot. Mr. Justice Pettit, delivering the opinion of the court, said: "My convictions are clear that our constitution was intended to and does secure the absolute secrecy of a ballot, and that the act in question, which directs the numbering of tickets to correspond with the numbers opposite the names of the electors on the poll lists, is in palpable conflict, not only with the spirit, but with the substance, of the constitutional provision. This act was intended to and does clearly identify every man's ticket, and renders it easy to ascertain exactly how any particular person voted. That secrecy which is esteemed by all authority to be essential to the free exercise of suffrage is as much violated by this law as if it had declared that the election should be *viva voce.*" Mr. Chief Justice Denio,

in *People* v. *Pease*, 27 N. Y. 45, 81, used the following language: "I have already alluded to the policy of the law providing for a secret ballot. The right to vote in this manner has usually been considered an important and valuable safeguard of the independence of the humble citizen against the influence which wealth and station might be supposed to exercise. This object would be accomplished but very imperfectly if the privacy supposed to be secured was limited to the moment of depositing the ballot. The spirit of the system requires that the elector should be secured then, and at all times thereafter, against reproach or animadversion, or any other prejudice, on account of having voted according to his own unbiased judgment, and that security is made to consist in shutting up within the privacy of his own mind all knowledge of the manner in which he has bestowed his suffrage." Cooley, Const. Lim. (5th Ed.) p. 760; McCrary, Elect. § 454; *Williams* v. *Stein*, 38 Ind. 89; *Pennington* v. *Hare*, (Minn.) 62 N. W. 116; *Attorney General* v. *McQuade*, 94 Mich. 439; *Parvin* v. *Wimberg*, (Ind. Sup.) 30 N. E. 791; *State* v. *Anderson*, (Fla.) 8 South. 1.

In states where the constitution expressly provides for numbering the ballots, the courts doubtless hold such numbering lawful, and the provision mandatory. This is so in Texas, where the constitution, in article 6, § 4, provides: "In all elections by the people, the vote shall be by ballot, and the legislature shall provide for the numbering of tickets," etc. *State* v. *Connor*, 86 Tex. 133. As will be seen, in that state the numbering of ballots is expressly authorized by the organic law, whereas our constitution not only has no such provision, but expressly commands a secret ballot. The case of *Hodge* v. *Linn*, 100 Ill. 397, cited in the opinion of the Chief Justice, ought not to be regarded as a controlling authority in

the case at bar, because the constitution of that state does not expressly provide that the ballot shall be secret. See Const. Ill. 1870, art. 7, § 2. The same may be said of the Missouri cases cited in the opinion. See Const. Mo. 1865, art. 2, § 1.

I am of opinion that so much of section 26 of the act approved March 28, 1896 (Sess. Laws, p. 183), as provides for the identification of the ballot, is in violation of the constitution and void; and, in arriving at this conclusion, I am not unmindful of the salutary rule that in the interpretation of statutes all doubts should be solved in favor of the constitutionality of their enactment. The rule is well established, and founded in the highest wisdom. Because, however, a small portion of an act is invalid, it does not necessarily follow that the whole act is void. All that portion of the act which is not repugnant to the constitution is valid. While the numbering of the ballots was improper, still that circumstance should not have the force to avoid the act and overturn the election. The electors were not responsible. Their ballots were honestly cast, and there has not been sufficient reason shown why they should not have been so counted. The writ ought to be denied.

MINER, J.:

I concur in the opinion of Justice BARTCH, and in the holding that the journal of proceedings to be kept by the two houses composing the legislature, under section 14, art. 6, of the constitution, may be examined and inquired into for the purpose of determining any conflict between them and the enrolled acts. In cases of conflict the journal entries should govern and control the presumption arising from enrollment. I also concur in holding that part of section 26, c. 69, p. 183, Laws 1896, with refer-

ence to numbering the ballots, as being in violation of section 8 of article 4 of the constitution, which requires all elections to be by secret ballot. I also concur in the opinion of Chief Justice ZANE, with the exception of the matters above referred to.