Ernest H. DEAN, etc., et al., Plaintiffs,

v.

The Honorable Calvin L. RAMPTON, Governor of the State of Utah,
et al., Defendants.

No. 14080.

Supreme Court of Utah.

July 2, 1975.

**170**

———◆———

Melvin E. Leslie, Gary E. Atkin, Salt Lake City, for plaintiffs.

Vernon B. Romney, Atty. Gen., Homer Holmgren, Randolph S. Collins, Robert B. Hansen, Asst. Attys. Gen., Salt Lake City, for defendants.

ELLETT, Justice:

This matter involves the construction of Article VI, Sec. 24, of the Utah Constitution, as amended in 1972, which reads:

> The presiding officer of each house, not later than five days following adjournment, shall sign all bills and joint resolutions passed by the Legislature, certifying to their accuracy and authenticity as enacted by the Legislature.

The facts are not in dispute: House Bill 41 passed the House on the third reading on January 24, 1975. It passed the Senate with amendments on February 21, 1975. It was then referred to a conference committee on February 24, and both houses concurred with the committee report and passed the final bill on March 4, 1975. It was signed by Mr. Rencher, Speaker of the House, on March 5, 1975. The legislative session ended March 13, 1975. However, Mr. Dean, President of the Senate, through oversight neglected to sign House Bill 41 within the five days following adjournment. The bill was engrossed and sent to the Governor, who signed the same on March 20, 1975. However, Mr. Dean, as President of the Senate, did sign his name on a separate signature sheet, and the same was filed in the office of the Secretary of State on March 24, 1975.

The Attorney General was of the opinion that House Bill 41 could not be published as a part of the regular session laws of Utah, 1975, for the reason that the signature of the President of the Senate was not written on the signature sheet attached to the bill.

Mr. Dean and Mr. Rencher petitioned this court to issue an alternate writ of mandate requiring the defendants to cause House Bill 41 to be included in the published laws of Utah, 1975, or to show cause why they should not do so.

The Constitution of Utah says that the presiding officers of the two houses of the Legislature *shall* sign all bills. There is no discretion in either officer to refuse to sign any bill which has been passed by the house over which he presides.

If either presiding officer could withhold his signature until the required five days had elapsed, he would have a veto power greater than that vested in the Governor. In order to prevent a bill from becoming a law, the Governor must do an affirmative act, to wit, return it to the house in which it originated with his objections noted thereto. If he fails to return the bill within five days after he receives it, it will become a law in like manner as if he had signed it.[1]

If the argument of the Attorney General is correct, each presiding officer has a veto power by simply doing nothing.

No such power was ever intended to be given to the President of the Senate or to the Speaker of the House. Neither of those officers seeks such power, and by this proceeding they seek to have this court say that they do not have that power.

---

1. Article VII, Sec. 8, Utah Constitution.

The purpose and intent of the section above quoted is to give accuracy and authenticity to the legislation which resulted in the enactment of a bill.

There are other ways of ascertaining the accuracy and authenticity of an enactment. In the case of People v. Clayton [2] the territorial Supreme Court had the problem of determining whether an act of the territorial Legislature was properly passed. It quoted from Wharton on Evidence as follows:

> . . . [A] court will take judicial notice of the journals of a legislature to determine whether an act is constitutionally passed, or whether it has passed by reason of not having been returned in proper time by the governor. There is, then, no need of stating what appears upon the journals of a legislature relative to the passage of a law. Such matters are judicially noticed without averment, and the same effect given them as if averred. . . . Out of a multitude of citations not one is found in which any court has assumed to go beyond the proceedings of the legislature, as recorded in the journals, required to be kept in each of its branches, on the question whether a law has been adopted. . . .

After Utah was admitted as a state, this court had before it the case of Ritchie v. Richards,[3] wherein the question was presented as to whether an enactment of the Legislature was made according to constitutional requirements. Mr. Justice Bartch, with whom Justice Miner concurred, stated:

> . . . When the enrolled act is assailed in a court of law on the ground that it was not constitutionally passed by the legislature, the court must determine whether there was a compliance or non-compliance with the mandatory provisions of the constitution respecting the mode and manner of the passing of the act. For this purpose, I have no doubt

that, upon principle, as well as authority, the court may take judicial notice of the legislative journals, and, in a proper case, go behind the enrolled act, even when such act has been properly authenticated and deposited with the secretary of state, and examine such journals, giving their contents such weight as evidence as they may be entitled to receive, considering the manner in which they are kept, and circumstances under which the entries have been made; . . .

The journals of each house clearly show that the bill was properly passed. Thus the need for certification by the presiding officer of a house is not the only means by which a court can determine the accuracy and authenticity of an enrolled bill.

If a presiding officer obstinately refused to do his duty to sign a bill, the courts could look to the journals, and if the bill was properly passed, the officer could be compelled to do his constitutional duty and sign the bill. If a recalcitrant presiding officer who seeks to prevent a bill which has been duly passed from becoming a law can be compelled to do his duty and sign his name, how can it be said that an officer who by oversight failed to sign cannot do his duty without court compulsion?

Perhaps a presiding officer who refuses to do his duty and sign as required could be expelled from his membership in the Legislature, but he certainly ought not be permitted to defeat legislation which has been duly enacted by a failure to sign his name.

We hold that the requirement of the constitutional provision in question is simply to give evidence of the accuracy and authenticity of the bill, and if the officer fails or refuses to sign within the five-day period, the courts can determine from the journals of each house whether the proceedings relating to the enactment were accurate and authentic.

2. 5 Utah 598, 600, 18 P. 628 (1888).

3. 14 Utah 345, 363, 47 P. 670 (1896).

Two states of the Union have held as we now do.

The Nebraska Supreme Court had a case similar to the instant matter [4] wherein the president of the Senate had not signed a bill in the presence of the Senate as required by Art. II, Sec. 20, of the Nebraska Constitution. In holding the law to be validly enacted, the court said:

. . . It is claimed that the "act for the maintenance and support of illegitimate children," approved February 25, 1875 (Laws, 1875, p. 53), is void, because not signed by the president of the senate. An inspection of the original act, in the office of the secretary of state, shows that the act passed the house of representatives, and was duly attested, and was signed by the speaker of the house. The act is also attested by the secretary of the senate, and is approved by the governor, but is not signed by the president of the senate. Does this omission invalidate the act? Section 20, art. II of the Constitution of 1867 provides that "the presiding officer of each house shall sign publicly, in the presence of the house over which he presides, while the same is in session and capable of transacting business, all bills and joint-resolutions passed by the legislature." . . . An examination of the journal of the senate at that session shows that the bill passed the senate by a vote of twelve in favor of and one against it. The signature of a presiding officer to a bill is a mere certificate to the governor that it has passed the requisite number of readings, and been adopted by the constitutional majority of the house over which he presides.
. . .

A like problem was before the Supreme Court of Kansas,[5] wherein it was said:

A final objection is that the act was not signed by the presiding officers of the respectives houses within two days after its passage, as required by section 14 of article 2 of the constitution. If the contention of the plaintiff is sound, then a veto power rests in the presiding officers of the two houses, which has remained undiscovered from the organization of the state government to this time. It would undoubtedly be a very great surprise to the general public if it were to be declared by this court that the lieutenant governor and the speaker of the house, by merely delaying for more than two days to attach their signatures to it, could effectually kill a law duly passed by the senate and house. . . .

We are aware that other states have held similar constitutional provisions to be mandatory. However, we think our decision herein is more consonant with reason and the intent of the voters of this state when they approved the amendment.

■ Since there is no doubt at all about the accuracy and authenticity of House Bill 41, the defendants are hereby *advised* to include it in the Session Laws of Utah 1975. Since this matter was brought to have a determination of the legality of the bill, we do not deem it necessary to *order* the defendants to do their duty. No costs are awarded.

CROCKETT and MAUGHAN, JJ., concur.

HENRIOD, Chief Justice (dissenting):
I dissent because:

I. The petition is not well taken because of non-joinder of parties;

II. It is offensive to procedure having to do with the extraordinary writ of mandamus; and it lacks substance in law and fact.

As to I: The Secretary of State was not made a party to this proceeding. He is the custodian of the Constitution, acts passed by the legislature, its journals, etc.;—and the

4. Cottrell v. The State, 9 Neb. 125, 128, 1 N. W. 1008, 1009 (1879).

5. Aikman v. Edwards, 55 Kansas 751, 765, 42 P. 366, 371 (1895).

State's Great Seal.[1] The petition here is directed to a lot of individuals, including the Governor, the Finance Director and the Archivist, if these people have any standing here, they should be petitioners seeking to have the Secretary of State, who logically would seem to be the defendant, who according to 67–2–1, U.C.A.1953, cited above would be the keeper not only of the Great Seal but the so-called "Litter" bill (which seems to have meant the opposite, since it was an "Anti-Litter" bill). This gentleman refused to authenticate the Bill because he would have put the lie to the documentary procedural conundrum here. The case should have ended on that note for lack of parties particeps.

II. On March 18, 1975, an engrossed copy of H. B. 41, headed "Litter Amendments" was received by the Governor, accompanied by a certification form, under the signature of the Speaker of the House as of March 5, 1975, as attested to by the Chief Clerk of the House, but *not* signed by the President of the Senate, although attested so to have been signed as of March 4, 1975, by the Secretary of the Senate. The Governor approved and signed the Bill on March 20, 1975, and the Secretary of State received the Bill and attachment on March 20, 1975. Four days later on March 24, 1975, the Secretary of State received one lone sheet, identical in form to that which contained the signatures of the Speaker of the House and the Governor, on which the President of the Senate's signature appeared, alongside of an identical attestation certificate signed by the same Secretary of the Senate, stating again that the President of the Senate signed H. B. 41 on March 4, 1975,—which obviously appears to be inaccurate.

The Governor and everyone else except the Secretary of State, obviously neglected to take note of the fact that it appeared the Bill sent to the Governor had not been signed by both the Speaker and the Senate President.

The Constitution states that the President of the Senate "not later than five days following adjournment, shall sign all bills and resolutions passed by the Legislature, certifying to their accuracy and authenticity as enacted by the Legislature."

This language is in the imperative, not the permissive. The decision in the instant case, on the other hand, is in the permissive, not the imperative,—which is epitomized in the main opinion when it is said that the "President of the Senate, *through oversight* neglected to sign House Bill 41 within the five days following adjournment,"—followed by an apologia therefor that I cannot find or justify in the language of the constitution or any Utah decision to support it,—to the unusual effect that *if* the constitution were applied as written and *if* interpreted in its plain pronouncement, a presiding officer would have some kind of a veto. The answer to such premise is a question: "So what?" If such be the case, what would prevent the Governor from sending a paper anytime,—perhaps weeks after hours, to say he signed a bill before the ten days that otherwise would result in a pocket veto under Article VII Section 8—in order to *validate,* instead of *veto* a law?

There is no reason for saying the constitution did not mean exactly what the constitution said it said,—and therefore meant. If looseness on the part of those subservient to constitutional interdiction, results in an interpretation other than is plainly expressed,—then unreason and illogic easily by indolence or inattention to articulation, could modify the commandment that "Thou shalt not steal," to mean only that "Thou shalt not steal, except when stealing wholesale, not retail" as one McCarty would say to the judge. The fact that the main opinion volunteers that "No such power was ever intended to be given to the President of the Senate or the Speaker of the House," and hence he need not sign a Bill to make it a law, can be answered

---

1. 67–2–1, U.C.A.1953.

with another question: "Who said so?" The answer to the latter, it would seem to be, is this opinion, where we say we do,— not the legislature or constitution.[2]

The veto power has nothing to do with this case, nor has it any place in the opinion. If the action or inaction of an officer of the legislature is such as to result in a legislative still birth, the judicial obstetrician's job is frustrate, and talking about a power to veto cannot breathe life into that which has not been conceived and is not born. The only things that might ameliorate such circumstance would be change of legislative method or person, suffrage, or, as could be done in this case, providing a missing link to contemplated legislation at a special session of the legislature, or reintroduction and passage thereof next January at the legislature's next regular session and in the meantime to let the litter lie as a lesson to legislator and layman alike.

There is talk in the main opinion about Journals and their sanctity. All of such talk invites provocative ipse dixits and non-sequiturs. Journals have but one purpose,—to explain something factual, not to try and explain or change the plain meaning of words used by the legislature.

There is nothing in the Constitution or legislation that says "This Constitution, or legislation, may be amended or ignored from time to time by entries in the Journals of one or both houses of the Legislature." The only conclusion one justifiably can employ in a case like this, is that we must read the legislative language, parse its sentences and, if clear, and the words say that in order to create a new law, someone *"shall sign it first,—*then *first* someone *must sign* it. That is this case, where the language has not been parsed, but parslied, or paralyzed.

The Petitioners' Memorandum of Authorities ignores Ritchie v. Richards, 14 Utah 345, 47 P. 670 (1896),—a case decided about four score seven and two years ago in the year Utah became a state. This case is commended to the reader in support of this dissent.

It was written by the eminent Mr. Chief Justice Zane, where a writ of mandamus involving a district court judge's status under a legislative act was involved. Although acknowledging that the journals may be examined as some evidence of facts that may be in dispute or otherwise pertinent, he discounts them quite generally as media to interpret plain language or sanctions. He makes several poignant observations that certainly are apropos and in my opinion, dispositive of this case,— calling for the conclusion that H. B. 41 never did and never could become the law of this state under the circumstances that have been directed to our attention, except in virtue of the instant decision. The Ritchie case has stood the test of time for over 80 years, enjoys the reputation of never having been criticised or questioned, and consequently rates very highly as an authority on that about which we are talking.

Another authority which lends substance to the idea that the judiciary should tamper quite temperately, and not too hastily with the clear unmistakable and easily understood language of those who perhaps used a lot of sweat and ink to prevent such invasion into the domain of fundamentals, —which appears to be the case involved here. That authority is 95 A.L.R. 273, et seq.

TUCKETT, J., concurs in the views expressed in the dissenting opinion of HENRIOD, C. J.

---

2. Maybe that for which we from time to time have expressed disapproval in some U. S. Supreme Court decisions, may have been a bit of inconsistency.