J. R. RICHARDSON, Respondent, v. TREASURE HILL MINING CO., SHARP WALKER, W. H. DODGE, F. B. COOK, W. T. ERCANBRACK, C. F. ERCANBRACK, WM. PISCHEL et al., Appellants.

CORPORATIONS—MINING—ORGANIZATION—UNDER CHAP. 87, SEC. 2, SESS. L. U. 1896, P. 299—PAYMENT FOR STOCK—PAYMENT FOR STOCK SUBSCRIPTIONS—PROPERTY—EVIDENCE OF VALUE—ABSENCE OF FRAUD—CREDITORS' CLAIMS—MINING CORPORATION—PROPERTY FOR CAPITAL—WHEN VALUE SHOULD BE ESTIMATED—TESTS—WHEN PROPERTY TAKEN FOR STOCK—SEC. 18, ART. 12, CONST. CONSTRUED—RULE OF CONSTRUCTION—PUNCTUATION—PROCEEDINGS OF CONSTITUTIONAL CONVENTION—WHAT AID TO CONSTRUCTION.

1. CORPORATIONS: MINING: ORGANIZATION: UNDER CHAP. 87, SEC. 2, S. L. U. 1896, P. 299: PAYMENT FOR STOCK. Under the provisions of section 2268, C. L. U. 1888, as amended in chapter 87, section 2, S. L. U. 1896, page 299, when in the organization of a mining corporation the several provisions of such statute are complied with in good faith by the incorporators, the stock is, in law, as fully paid, as if payment therefor had actually been made in money, and the holders of the stock are not liable for unpaid subscriptions.

2. PAYMENT FOR STOCK SUBSCRIPTIONS: PROPERTY: EVIDENCE OF VALUE: ABSENCE OF FRAUD: CREDITORS' CLAIMS. Where there is no proof which warrants an assumption that the incorporators were actuated by fraud in the organization of a corporation, in fixing the amount of the capitalization, or estimating the value of the property, and it is not shown that there was such excessive overvaluation of property as to authorize an inference of fraud, and the evidence shows that the mining claims embraced in the leases and bonds transferred to the corporation in payment of capital stock, were situated in a mining

Richardson v. Mining Co.

district where there was much activity at the time of incorporation; that much interest was then manifested in property in that vicinity; that one of the claims had been a heavy producer and had been extensively worked in the past and that there was still much low-grade ore in sight; that the lessees for some months before the incorporation, had been working and developing the property; that the corporation continued to work and develop the same up to the time it ceased to pursue its corporate business and received about $10,000 for ore extracted; and that stockholders paid into the treasury, by way of voluntary assessments, an amount in cash which with sales of ore aggregated $35,000, all of which was expended in operating and developing the mine, it can not be held that at the date of incorporation the property was valueless, nor that subscriptions to capital stock remain unpaid and must be paid by the stockholders to satisfy the claims of creditors.

3. MINING CORPORATION: PROPERTY FOR CAPITAL: WHEN VALUE SHOULD BE ESTIMATED. Where property is taken in payment of capital stock at the inception of a corporation the question is what was the fair estimated cash market value of the property at the date of incorporation and not at a time when, through the expenditure of large sums of money, the property has been demonstrated to possess no value.

4. TESTS: WHEN PROPERTY TAKEN FOR STOCK: NOTICE. Honesty and good faith are the tests, and when it appears that the value of mining property, taken for capital stock, was fixed honestly and in good faith; that the owner had title thereto, and that the property was conveyed to the corporation and accepted by it, in full payment of the capital stock, the courts will not disturb the transaction and parties dealing with the corporation are bound to take notice of what lawfully appears in the articles of incorporation and in the statutes under which it was created.[1]

5. SEC. 18, ART. 12, CONST., CONSTRUED. Section 18, article 12, of the Constitution applies only to corporate banking institutions and not to other corporations.

6. RULE OF CONSTRUCTION: PUNCTUATION. The meaning and intent of a constitutional provision must be gleaned from the context of the instrument; as a general rule, punctuation is no part of an enactment.[2]

[1]Transit Co. v. Lynch, 18 Utah, 378; Henderson v. Turngren, 9 Utah, 432.

[2]Hardware Co. v. Milling Co., 13 Utah, 423 (Distinguished).

7. PROCEEDINGS OF CONSTITUTIONAL CONVENTION: WHAT AID TO CON-
STRUCTION. While, in general, the proceedings of a convention are
less conclusive in determining the proper construction of a provision
of the Constitution than are legislative proceedings in determining
the construction of a statute, still where the inquiry is designed to
ascertain the purpose sought to be accomplished by a particular pro-
vision, an examination of the proceedings of the convention which
framed the instrument is proper, and if the proceedings clearly show
the purpose, their aid in interpretation is valuable.[3]

Decided April 16, 1901.

Appeal from the Third District Court, Salt Lake County.—
*Hon. Ogden Hiles,* Judge.

Action against defendant company and its stockholders to
subject the stockholders to a personal liability for stock sub-
scriptions. From a judgment for plaintiff, defendants ap-
pealed.

REVERSED.

*Messrs. Pierce, Critchlow & Barrette,* and *Messrs. Rich-
ards & Ferry* for appellants.

We hold and confidently assert that the Incorporation
Law *by its terms* permits mining property to be used at a fairly
estimated value in payment for stocks, and that no subsequent
change of conditions, no revision of judgment, can render un-
paid that which was once fully paid.

There are two theories which have been set forth by the
courts in cases like this. One theory is that the property must be
put into the corporation at its true or actual value; the other is
that when the incorporators have acted in good faith and upon

---

[3]State v. Norman, 16 Utah, 457.

a basis which at the time seemed reasonable, then the stock is fully paid, although it shall afterward turn out that their expectations were not realized, and the real true value of the property was either nothing or much less than the value assigned it at the time of the incorporation.    Mr. Thompson, in his work on Corporations, sections 1616 to 1619, recognizes these two rules.    He, himself, as is well known, has always contended for the highest measure of accountability upon the part of incorporators, and he is of the opinion that the better rule. would have been what he there terms the "true value" rule.    But he candidly recognizes the fact that the authorities are against him.    He cites two States, to-wit: Maine and Missouri, which hold to the "true value" rule.    He recognizes, however, that the other States, as well as England, hold to the doctrine that an overvaluation will not render the incorporators liable, unless such overvaluation has been fraudulent, and that an *excessive* overvaluation will be regarded by the court as evidence of fraud.    Bank of Fort Madison v. Alden, 129 U. S. 372; Handley v. Stutz, 139 U. S. 432; N. W. Mutual Life Ins. Co. v. Cotton Exchange, 46 Fed. Rep. 24; N. W. Mut. Life Ins. Co. v. Cotton Exchange, 70 Fed. Rep. 155; Grant v. East & West Ry. Co., 54 Fed. Rep. 569; Young v. Erie Mining Co., 65 Mich. 111; Schenck v. Andrews, 57 N. Y. 147; Douglas v. Ireland, 73 N. Y. 100; In re Smith Mountain Cons. Mng. Co., 14 Fed. Rep. 347; 2 Morawetz Corp. (2 Ed.), sec. 830.

The rule contended for as to corporations for general purposes is laid down in Wisconsin in Whitehill v. Jacobs, 75 Wis. 474 (1890).    For Montana in respect to mining corporations in Kelley v. Fourth of July, 53 Pac. Rep. 959.

It was further suggested by counsel in the lower court, in argument, that our Constitution (sec. 18, art. 12) makes every

stockholder liable for the debts of the corporation.    This turns
upon a question of punctuation, and may or may not be now
seriously insisted upon.    If it is, we call attention of the court
to the official report of the proceedings of the constitutional
convention.    The discussion of this section of the Constitution,
and of certain proposed sections wherein it was proposed to
make the stockholders of insurance companies liable as stock-
holders of banking corporations are liable, to the amount of
their stock, for debts of the corporation, shows beyond a doubt
that this section, as it now appears, was intended to cover *bank-
ing corporations only.*

However, it is a well-recognized principle that punctua-
tion in a statute will not control its construction, and where
the legislative sense requires it, a comma may be transposed.
The application of B. F. Railroad Co., 125 N. Y. 434.

Furthermore, our own Supreme Court has given to the
section its proper construction in Wyeth Hdw. Co. v. James
I. B. Co., 15 Utah, 114.

As to the defense of a stockholder to the claim of a cred-
itor on liability for corporate debts, see 1 Cook on Corpo-
rations (4 Ed.), sec. 76; Sedgwick City Bank v. Sedgwick
M. & E. Co. (1898), 54 Pac. Rep. 681; Camden v. Stuart,
114 U. S. 114.

*Richard B. Shepard, Esq., Harrison O. Shepard, Esq.,*
and *Messrs. Patterson & Moyer* for respondent.

In the case of Henderson v. Turngren, 9 Utah 439, this
court, speaking through Justice Smith, says:

"The subscribers of the capital stock of a corporation
must pay for their stock either money or money's worth," and
further that, "the public in dealing with a corporation has
the right to assume that its actual capital in money or money's

worth, is equal to its capital stock, which it purports to have."

Since statehood, this court has affirmed the case last cited and emphasized the same by the following pointed language:

"In cases where the statute justified the taking of property in payment for stock, if the property taken was worthless, shadowy and unsubstantial in its nature, courts hold that there has been no payment at all, and in such cases, stockholders are liable on such *fraudulently* obtained stock for unpaid subscriptions." Hardware Company v. Milling Co., 13 Utah 425; Libbey v. Tobey, 82 Maine 397; Wishard v. Hausen, 99 Iowa 307.

The Constitution of our State fixes another and additional rule, by which to gauge a stockholder's liability to creditors. Section 18, article 12; section 4 of article 12; section 26 of article 1.

These sections are self-enforcing, and no legislative act is necessary to carry them into effect.

Appellants contend that as punctuated, the double liability exists, but attempt to have a rule adopted, viz., that allows courts to re-punctuate a law, even if it makes sense and expresses the legislative will as punctuated. Such a rule would do violence to common sense, and all judicial interpretations upon the question.

We gather the legislative will from the whole article, and when so gathered, it will show that it was the intention of the framers of the Constitution, that the section should be read as they left it, without any interference whatever. It is true that punctuation does not control, where, as punctuated, it fails to make sense. Yet we know of no rule that requires, or even admits, a new punctuation, where the language makes sense as punctuated. Union R. Co. v. Lynch, 55 Pac. Rep. 639.

Richardson v. Mining Co.

STATEMENT OF FACTS.

This is an action against the Treasure Hill Mining Company, a corporation, and its stockholders, to recover upon a certain judgment against the corporation and claims of creditors which were assigned to the plaintiff. From the record and evidence it appears that the defendant corporation was duly organized under the laws of Utah, in June, 1897. About five months previous to that time several of the incorporators engaged in the business of mining in the Tintic mining district, and obtained leases and bonds upon the "Valley," "Cornucopia" and "Erca" mining claims, and also a lease upon the "Golden Treasure" claim. These claims were contiguous and formed a group. The leases and bonds thus obtained were transferred to the corporation at the time of its incorporation, and were taken in full payment of its capital stock, which was placed at $25,000, divided into 25,000 shares of the par value of $1 each. The incorporators became the subscribers for the stock, and the same was issued to them in various amounts as subscribed for. The original lessees worked and developed the property up to the time of the incorporation, and then the corporation continued to do development work until the spring of 1899, when it ceased operations. At this time the operating expenses had amounted to about $35,000, of which sum about $10,000 had been received from the sale of ore, which had been extracted in developing the mine, and the balance from voluntary assessments levied upon the stock and paid into the treasury of the corporation by agreement of the stockholders, the stock being non-assessable. Under the leases, which were made in the usual manner and form, the lessees were to pay as royalty from ten to fourteen per centum, according to the grade of the ore, of the amount received for the ores extracted, and the corporation had the option to purchase the leased property

at any time, during the life of the leases, for the aggregate sum of $86,666. The Golden Treasure claim had been extensively worked, in former days, and very large quantities of ore extracted therefrom, and a large amount of low-grade ore was still exposed. It had the reputation of having been a heavy producer but was not operated by the owners in the early part of 1897. As to the actual value of the group of claims at the time of the incorporation, the testimony appears to be conflicting. Some witnesses placed the value at from $20,000 to $30,000, and some at less, while others valued it at more than $100,000, or at as much as the amount of the option to purchase and the par value of the stock of the corporation combined. The witness, McQueen, who was for about two years superintendent of the property while it was being operated, testifying in behalf of the plaintiff, was asked the following question: "Mr. McQueen, from your knowledge of that property, can you say what sum of money it would have brought in cash, supposing you wanted to convert it into cash ?" The answer was: "Well, I would only say that I would only recommend it for a certain amount of money. I would recommend it to friends for $20,000 or $30,000; would do that now." On cross-examination the witness said: "Without a pound of ore in sight, I think it is worth $20,000 or $30,000. The opportunity under lease and bond of going into mining property, which has produced ore and which gives to a mining man the prospect of producing still greater quantities of ore, would be a privilege or option, which, in the mining market, would be a big help to a man in making a trade. It has a substantial value."

Questions by the court and answers by the witness, Blanchard, who testified in behalf of the defendants, appear, as follows: "Court: Now, Mr. Blanchard, taking that Cornucopia mine and the Valley mine and the Erca and the other

which made up this group, can you say that in 1897 and 1898 that group could readily have been converted into cash for $111,000 in this market? A. Yes, sir. Not everybody would have given that, but I don't think it would have been unreasonable to expect that they could sell it for that. Court: I am speaking of the group of mines of the Treasure Hill— could they readily now be sold here in Salt Lake or in this market for $111,000 in cash? A. I think a sale could be worked up at that price for cash."

The witness, Roberts, stated: "The options were worth fully the amount of the bonds, and I considered the lease alone worth the $25,000 or more."

The witness, Lawrence, said: "I know nothing about the Treasure Hill property to form an opinion as to its value only with reference to its relative position. It is situated in that portion of the Tintic district where there was an active interest taken in the mines of the vicinity during 1897, 1898, and 1899. There was a great activity, especially in that part of the district. I am only familiar with the Treasure Hill property by reputation; that it has been a producer."

When the corporation ceased operations, the amount of its indebtedness, it appears, exceeded $2,400, consisting of a judgment and various creditors' claims, for which this suit was brought. At the trial, the court held that the property transferred to the corporation, as payment in full for its capital stock, was valueless; that no one of the incorporators paid anything of value for his stock subscribed for by him; that nothing of value was paid to the corporation for the stock; that the corporation was at all times insolvent and unable to pay its debts; that the defendants, Sharp Walker, D. F. Walker, Jr., C. F. and W. T. Ercanbrack, Cook, Pischel and Dodge, each and all became liable for the corporate debts sued upon; and that judgment should be entered against those de-

fendants and the corporation, for the sum of $2,422.16 and costs.   Judgment was entered accordingly, and thereupon this appeal was prosecuted.

A statement of the case as above having been made, BARTCH, J., delivered the opinion of the court.

Owing to the great importance of the question presented in this record, we have concluded to reject the several technical objections made against the consideration of this case upon this appeal, and to render a decision upon the merits.

It is insisted for the appellants that the plaintiff is entitled to no relief, and that the court erred in holding that, under the evidence, the stockholders are liable for the debts of the corporation.

The respondent contends that the shareholders are liable, under our Constitution and statutes for an amount equal to any unpaid balance of subscription to the stock, and for an additional amount equal to the fully paid up stock, if the same be required for the payment of corporate debts.   The first question which we will consider is whether, under the facts disclosed by the evidence and the law applicable to them, the stockholders of the corporation are liable to its creditors for unpaid subscriptions to its capital stock.

It appears the defendant corporation was organized for the purpose of conducting the business of mining, under section 2268, C. L. U. 1888, as amended in c. 87, sec. 2, Sess. Laws, 1896, p. 299, which as amended, and so far as material here, reads, as follows: "Provided, that where the amount of the capital stock of any corporation which may be formed under the provisions of this act, consists of the aggregate valuation of property, for the working, development, management, use, sale or exchange of which such corporation shall be formed, no actual subscription in money to the capital stock

of such corporation shall be necessary; but each owner of such property shall be deemed to have subscribed such an amount to the capital stock of such corporation as will represent the fair estimated cash market value of so much of said property or such an interest therein, the title to which he may, by deed of trust, convey, or may have conveyed or vested in such corporation, such subscription to have been deemed to have been paid in upon the execution and delivery to such corporation of such conveyance or deed of trust; Provided further, that this section shall not be so construed as to prohibit the stockholders of any corporation from regulating the mode of making subscriptions to its capital stock, and calling in the same by by-laws or express contract; and provided further, that where subscriptions to the capital stock of any company are paid in other than money, the fact shall be so stated, and the kind of property, with a description thereof, specified in the articles of agreement.   Where any subscription to the capital stock of any corporation, except corporations organized for mining or irrigating purposes, is paid for in property other than money, there must appear in the articles of incorporation a description of the property so taken, and a statement of the fair cash market value thereof, accompanied by the oath of three persons who know its market value, that it is reasonably worth the amount for which it is accepted by the corporation. If the property has no ascertainable market value, then that fact must be stated in the affidavit, together with a statement of its estimated cash value."

Under these provisions of the statute, as will be noticed, "no actual subscription in money," by the incorporators of a corporation, to its capital stock, was necessary, but such stock could be paid for in property, and, in such case, each owner was "deemed to have subscribed such an amount of the capital stock," as would represent the "fair estimated cash market

value" of the property or interest therein conveyed, by such owner, to the corporation, and the subscription was deemed to have been paid in upon the execution and delivery of the instrument of conveyance to the corporation. The mode of making subscriptions to stock, and of calling them in, was left to the stockholders, but where such subscriptions were "paid in other than money," that fact had to be stated, and the kind of property, with a description of the same, specified in the articles of incorporation. It will be noticed further that corporations, organized for mining and irrigating purposes, were excepted from the provision requiring other corporations to make a statement, in the articles of agreement, of the fair cash market value of the property taken in payment of the stock, accompanied by the oath of three persons knowing such value, thus indicating an intention, on the part of the Legislature, to require nothing further, of incorporators of mining and irrigating companies, in regard to property taken for the capital stock, than to take it at its fair market value estimated by the incorporators in good faith. When, therefore, in the organization of such a corporation, the several provisions of the statute, relating to payment for stock with property, were complied with by the incorporators in good faith, the stock was in law as fully paid, as if payment therefor had actually been made in money. An examination of the articles of incorporation in the present instance, shows a substantial compliance with the letter of the statute. They were drawn up and executed in the usual manner according to the formalities required by law, and contain a provision, that "the private property of the stockholders shall not be liable for the debts or obligations of the corporation," in accordance with section 2286, as amended in c. 87, supra.

But counsel for the respondent insist, that, in fact, there was an evasion of the law in that there was no compliance

with the spirit of the law. Their position appears to amount to this: that while the evidence and the articles of agreement on the face show a transfer of certain leases and bonds with an option of purchase, the property, as matter of fact, was valueless; that, therefore, the corporation received nothing for its capital stock; and that the incorporation failed to act in good faith in accepting such property in payment for subscriptions to stock. This position does not appear to be warranted under the facts disclosed by the testimony.

The proof shows that the mining claims, embraced in the leases and bonds which were transferred to the corporation in payment of its capital stock, were situated in a mining district in which at the time of the incorporation there was much activity; that at that time much interest was manifested by those engaged in mining, as to properties located in the vicinity of those claims; that one of the claims, the Golden Treasure, had been a heavy producer in the past and had been extensively worked; that there was still much low-grade ore in sight in the mine; that the lessees, for some months before the incorporation, had been working and developing the property; that the corporation continued to work and develop the same up to the time it ceased to pursue its corporate business and received about $10,000 for ore extracted; and that the stockholders paid into the corporate treasury, by way of voluntary assessments upon their stock, an amount in cash which, with the $10,000 received from the sale of ore, aggregated about $35,000, all of which was expended in operating and developing the mine. Under such facts and circumstances it is difficult to see how it can be held that at the time of incorporation the property was valueless, and that therefore the subscriptions of the stockholders to the stock remain unpaid, and must be paid by them to satisfy the claims of creditors. Especially is this so, since there is no proof which warrants

an assumption that the incorporators were actuated by fraud in the organization of the corporation, or in fixing the amount of the capitalization, or estimating the value of the property. Nor is it shown that there was such excessive overvaluation of property as to authorize an inference of fraud. The undisputed fact that a much larger sum of money was expended in operating the property, than the sum for which the corporation was capitalized, of itself strongly repels the idea of fraud and indicates good faith on the part of the stockholders. It is true the evidence, as to value of the property, was conflicting, but then there is proof to the effect that it was of a very considerable value, some of it tending to show that such value was equal to the amount of the option, for which the corporation had the right to purchase, and the amount of the capitalization combined. Whatever the actual worth of the property in money may have been at the time of the incorporation, it seems clear from the proof that its value was such as to satisfy the requirement of the statute.

"There is nothing sacred about the par value of stock. Moreover, in business circles it has become customary to capitalize property at a reasonably high figure. This is due to the fact that it is easier to sell stock at less than par than at par, and also to the fact that, by a large capitalization, dividends are kept low enough to avoid the cupidity of possible competitors and the interference of Legislatures. To such an extent is this practice carried of issuing stock for property at an overvaluation, that the investing public and persons who give credit to corporations rather expect it, and they no longer rely upon the nominal capitalization of the company. Experience has taught them that they must investigate the real financial condition of the company, and invest or give credit upon that alone." Cook on Stock and Stockh. and Corp., sec. 46.

In the organization of a mining corporation where the capital stock is to be paid for in property, the statute does not require the property to be accepted at its actual cash value, but at its fair estimated cash market value. The fact that the property may have been deemed worthless when the corporation ceased to operate it, is wholly immaterial. The question in such a case always is, what was the fair estimated cash market value at the time of the incorporation? And not at some future time, when, through large expenditures of money or capital, the property has been demonstrated to possess no value. If this were otherwise, if stockholders in such a corporation, the moment the property, which had, in good faith, been deemed of ample value and taken in full payment of their stock, was by development thereof shown to be worthless, were to be held liable to creditors for the value of the stock, it is apprehended that few persons, especially those of limited means, would be willing to assume the risk of developing mines, and, no doubt, a purchaser of such stock, in the daily transactions of a stock board would, in case it should turn out that the mine was valueless and the corporation insolvent, be exceedingly surprised to discover that, by his mere purchase of the mining stock, he had contracted to pay the share of the nominal capital represented by his stock, should the same be required to liquidate the corporate indebtedness. Would not such a doctrine result in a fatal blow to the business of mining in this State, and close dealings in mining stocks? Would parties be willing, under such circumstances to take hold of a mining enterprise and spend their time and money in developing property of unknown value? Fortunately for the mining industry, such is not the law. The statute contemplates no such results. Under its provisions, as we have seen, incorporators of mining corporations are permitted, in the absence of fraud, to pay for their stock in property at its esti-

mated fair cash market value, whatever its actual cash value may be, and this is so even where the property has no ascertainable market value.    The fixing of such value is a matter of opinion.    It requires the exercise of judgment, and the exercise of judgment for such purposes, it is clear, the Legislature left to the incorporators, where the corporation is organized for mining purposes.    An opinion thus formed must be one honestly entertained, but it is subject to no other qualification. Honesty of purpose and good faith are the tests.    Where, then, it appears that the value of mining property was so estimated and fixed by the incorporators, without any fraudulent design, and that the owner had title thereto, and the same was conveyed to the corporation, and accepted by it, in full payment of its capital stock, the courts will not disturb the transaction, and parties dealing with a corporation are bound to take notice of what lawfully appears in the articles of incorporation, and of the statutes under which the corporation was created. This is so whether the actual value of the property at the time of the incorporation was equal to the capitalization or not, or whether or not the property was afterwards found to be valueless.    2 Mor. Priv. Corp., sec. 591.

And this can not be regarded as a hardship upon corporate creditors, for the public has long been aware of the fluctuating and uncertain character of mining property as to value. To-day it may be worth nothing, in a few months or years, millions. Stocks are up one day and down the next. Fortunes are made and lost as if by magic.    The price of the stock is determined by the prospects of the property, its location, development, riches, and quantity of ores, and the public confidence in the management.    The amount of the capitalization is no indication of the value of the mine, and no one familiar with mining operations regards it so.   Nor does any one who purchases fully paid stock, contract or intend to contract with

a view to the nominal amount expressed in the certificate, or suppose that he so contracts by implication or otherwise. The nominal capital neither bears, nor is intended nor supposed by the public to bear any relation to the real value of the property. What its real intrinsic value is, is nearly always conjectural if not entirely imaginary. All this is common knowledge which those dealing with a mining corporation may usually be presumed to possess. A person contracting with such a corporation, chargeable with full knowledge of the manner in which, and the purpose for which, it was organized, has no equitable claim against the stockholders for unpaid capital, when it afterwards turns out that the property has become valueless and the corporation insolvent. In such case the loss falls upon the stockholder to the extent of the money paid for his stock, and for the development of the property, and upon the creditor to the extent of credit given. Both share in the misfortune.

Mr. Morawetz, in his treatise on the law of Private Corporations, Vol. 2, sec. 830, says: "It has long been the general practice, both in New York and in California, to organize mining corporations with a nominal capital bearing little, or no relation to the real capital which the shareholders propose to contribute, and to issue the entire stock as fully paid up in consideration of mines whose market value is much below the amount of the stock so issued, and whose real value is generally nothing. This practice is so universal and so notorious, that a person who contracts with an ordinary mining company may usually be presumed to have contracted with a view only to such security as the property transferred to the company may furnish irrespective of the capital indicated by its charter. A person so contracting would, therefore, have no equitable claim against the shareholders for unpaid capital, if their shares were declared paid up as between themselves

and the company. It is to be observed, also, that the nominal capital of a mining company, by the very nature of the mining business, can not as a rule furnish an indication of the company's actual capital. The property of a mining company is naturally of an extremely fluctuating and uncertain character; moreover, it is acquired for the sole purpose of being exhausted and distributed among the shareholders in the form of dividends, and not as a permanent fund with which to carry on business."

The same may be said as to the general practice of mining corporations in Utah. If, in the case at bar, the proof had shown fraud in the payment of the capital stock and that the respondent had been misled because thereof, then there would have been substantial ground for the relief which he sought, and which the court below has attempted to grant, but in the absence of such a showing and in the face of the evidence which indicates that, at the time of the incorporation, the property had a considerable value, no such relief is justified on the ground that the subscriptions to the capital stock remained unpaid. The shareholders of such a corporation can not be held to be guarantors to all creditors for the final success of the enterprise. This is not like the case of a corporation where the stock subscriptions are payable in cash and have only been paid in part. In that case, in the event of the insolvency of the corporation, the unpaid subscriptions would become a trust fund applicable to the payment of the corporate debts. But this is not such a case, and that doctrine does not apply.

In Coit v. Amalgamating Co., 119 U. S. 343, the holder of a judgment against the corporation, being unable to obtain its satisfaction upon execution, and finding the company was insolvent, brought suit to compel payment by the stockholders of what he claimed to be due and unpaid on the shares held

by them.   His contention was that the valuation placed upon
the property taken for such stock was fraudulently and illeg-
ally made at an amount far above its actual value, but Mr.
Justice Field, speaking for the court,. said: "If it were
proved that actual fraud was committed in the payment of the
stock, and that the complainant had given credit to the com-
pany from a belief that its stock was fully paid, there would
undoubtedly be substantial ground for the relief asked.   But
where the charter authorizes capital stock to be paid in prop-
erty, and the shareholders honestly and in good faith put in
property instead of money in payment of their subscriptions,
third parties have no ground of complaint.   The case is very
different from that in which subscriptions to stock are payable
in cash, and where only a part of the installments had been
paid.   In that case there is still a debt due to the corporation,
which, if it becomes insolvent, may be sequestered in equity
by the creditors, as a trust fund liable to the payment of their
debts.   But where full paid stock is issued for property re-
ceived, there must be actual fraud in the transaction to enable
creditors of the corporation to call the stockholders to account.
A gross and obvious overvaluation of property would be strong
evidence of fraud." '

In Young v. Erie Iron Co., 65 Mich. 111, a case in many
respects like the one at bar, two parties by the name of Wright
procured a lease of a mining property and began upon their
own account to work and explore the same for iron ore.   They
expended about $3,000 in tools and labor upon the premises,
and discovered what they thought was valuable ore in paying
quantities.   The find was in the same range as one of the most
valuable and best paying mines in the Upper Peninsula, and
the ore partook largely of the nature and character of the ore
obtained from that mine.   Not having the means to develop
the leased property, they formed a corporation with a capital

stock of $500,000, divided into 20,000 shares, 3,000 shares of which was held by one of the Wrights as trustee for the corporation. The cash actually paid in, as stated in the articles of agreement, was $3,000, the amount expended by the lessees in discovering and working the mine, and $422,000 represented the estimated and agreed value of the lease held by the Wrights, which was assigned by them to the corporation by a sublease. Operations were then continued by the corporation, but the enterprise, though at first promising, proved unproductive. The corporation became indebted and insolvent, the leases were forfeited,. and the stock became worthless. Upon suit being brought by creditors against the corporation and stockholders, the lower court adjudged the stockholders liable, but upon appeal its decree was reversed and the case dismissed as to them. In the opinion it was said: "A leasehold like the one in the case at bar might well be thought, at one time, to be of enormous value, and subsequently be ascertained to not only have no value then, but really to have never been of any worth. If, in this case, in honest furtherance of a good-faith purpose, the Wrights, as the promoters of this corporation, fell into an error of judgment in placing the value of $422,000 upon their leasehold interest, it can not be held a fraud upon the creditors or any one else. In order for the court to find a fraud in law, there must be shown either an intentional fraud in fact upon the part of the Wrights, or such reckless conduct in the placing of this value, without regard to its real worth, as would indicate, without explanation, an intent to defraud." And again it was said: "If there was no fraud upon the part of the Wrights, but simply a mistake or error of judgment in the overvaluation of the lease, the authorities are nearly unanimous that the holder of the shares, purporting upon their face to be fully paid up

and non-assessable, can not be called upon to pay the debts of the corporation.    The transaction can only be impeached for fraud."

So, in Schenck v. Andrews, 57 N. Y. 133, it was stated: "I .entirely agree, that if the promoters of a corporation of this character shall, with a view to defraud, fill up the capital stock by putting in property at grossly exorbitant values, they are not to be exempted from the personal liability imposed by the statute.    In such case, they ought to respond in damages to the extent of the wrong they design to accomplish. But if, in the furtherance of an honest purpose, they fall into an error of judgment in placing a pecuniary value upon property supposed to be needful for the purposes of the enterprise, I think a different rule should prevail.    And I think it need only to be suggested, in support of this position, that, upon the question of the value of property, and more especially that adapted to mining, mechanical and manufacturing purposes, a very wide difference of opinion may honestly exist among the most intelligent of men familiar with such operations. There is no exact mathematical value which can be applied to mines or minerals in the bowels of the earth, or to mechanical contrivances or manufacturing establishments, when their development is sought for by associated wealth.    It is a matter of the commonest observation, that the most intelligent and conscientious of men, upon such questions, entertain widely different opinions; and it would be a fatal blow aimed at every such enterprise, if those who honestly risk their capital in such adventures shall be held as guarantors to all creditors for its eventual success."    Mor. Priv. Corp., sec. 831; Fort Madison Bank v. Alden, 129 U. S. 372; Handly v. Stutz, 139 U. S. 417; In re South Mountain Min. Co., 14 Fed. Rep. 347; Northwestern Mut. Life Ins. Co. v. Cotton Ex. R. E. Co., 46 Id. 22; Northwestern Mut. Life Ins. Co. v. Cotton

Ex. R. E. Co., 70 Id. 155; Grant v. East & West R. Co., 54 Id. 569; In re Wedgwood Coal and Iron Co., 7 Ch. Div. 75; Douglass v. Ireland, 73 N. Y. 100; Whitehill v. Jacobs, 75 Wis. 474; Kelly v. Clark, 21 Mont. 291; Commonwealth v. Central Pass. Ry., 52 Pa. St. 506; Carr v. Le Fevre, 27 Pa. St. 413.

Respondent cites us to the cases of Henderson v. Turngren, 9 Utah 432, and Hardware Co. v. Milling Co., 13 Utah 423. The facts in these cases are entirely different from those in the case at bar, and, therefore, neither of them can be regarded as controlling authority herein. We are clearly of the opinion that the plaintiff is not entitled to recover on the ground of unpaid subscriptions to the capital stock.

The remaining question, therefore, is whether, under the Constitution of this State, the stockholders of a mining corporation are individually responsible for an additional amount, equal to the amount of their stock fully paid, if the same be necessary to discharge the obligations of the corporation.

Section 18, article 12, Constitution, the one relied upon as fixing such additional liability, reads: "The stockholders in every corporation, and joint-stock association for banking purposes, in addition to the amount of capital stock subscribed and fully paid by them, shall be individually responsible for an additional amount, equal to the amount of their stock in such corporation, for all its debts and liabilities of every kind."

Counsel for the respondent insist that this provision of the fundamental law applies with equal force and effect to the stockholders of every corporation of what kind soever, fixing such additional liability of the stockholders to creditors, and maintains that under the terms, letter and spirit of the Constitution, the appellants are liable, to the creditors of the cor-

poration, in a sum equal to twice the par value of the stock subscribed for and held by them.

Counsel for the appellants insist that the section in question was intended to and does apply only to corporate banking institutions, and not to other corporations. This contention for the appellants is evidently correct and must be sustained.

Counsel for the respondent give undue prominence and effect to the comma appearing after the term "corporation." The comma can not be permitted to control the evident meaning and intent of the framers of the Constitution. What such meaning and intent is, must be gleaned from the context of the instrument itself. Punctuation can be given no more effect in the interpretation of a constitutional provision than in that of a statute. The general rule is that punctuation is no part of the enactment.

This court, in Transit Co. v. Lynch, 18 Utah 378, said: "The question of punctuation can not be allowed to control in the construction of these provisions of the statute, against, as we think, the manifest intent of the Legislature. It would be a most fallible standard by which to construe them. In the interpretation of statutes, the true meaning of the lawmaker must be ascertained from the whole purview, and when that is manifest from a judicial inspection, the court will not permit punctuation to change it. To ascertain the real intention and meaning of the statute, the court will punctuate or disregard punctuation as may be necessary. Punctuation may, when the meaning is uncertain, furnish some indication of it, but when the intention of the Legislature is apparent from a reading of the statute, such intention must prevail regardless of punctuation." Application of B. E. R. R. Co., 125 N. Y. 434.

The construction insisted upon by counsel for the respond-

ent, would not only change the real meaning and intention manifest from a judicial inspection of chapter 12 of the Constitution, but would also administer a severe, if not fatal, blow to most of the mining, manufacturing and commercial corporations within this State. Especially so, as to mining corporations, the value of the property and stock of which is, as is well known, nearly always of a fluctuating and uncertain character. Doubtless few persons would be willing to employ their means in purchasing stock in such corporations, if, by so doing, they were aware that at the same time they were contracting a liability in twice the par value of the stock. Nor, in the absence of express language to that effect, can it be imputed to the framers of the Constitution that they intended such results, especially since such an intention would have involved an entire change in the settled policy, as to such corporations, of the then Territory of Utah, for, up to the time of the constitutional convention, no one pretended that such stockholders were so liable. Nor does the record of proceedings in that convention show any disposition of members to impose such liability. But, in addition to all this, the interpretation urged to be applied would do violence to the familiar principle of constitutional construction, that every word should be given effect and its ordinary and known meaning, as used in common parlance, if possible; for, to hold that the provision contained in section 18 applied to all corporations of every kind would be to render useless, meaningless and superfluous the expression "and joint-stock association," because if the provision for the additional individual liability was intended to apply to every corporation whether organized for banking or other purposes, the word "corporation" was sufficient, as it, without limitation, includes the term "joint-stock association" contained in the expression quoted. This is made clear from a perusal of section 4, of the same chapter, which

reads: "The term 'corporation,' as used in this article, shall be construed to include all associations and joint-stock companies having any powers or privileges of corporations not possessed by individuals or partnerships, and all corporations shall have the right to sue, and shall be subject to be sued, in all courts, in like cases as natural persons."

Here the term "corporation" is given a broad meaning, and, as used in the article on Corporations of which sections 4 and 18 form a part, include every association and joint-stock company having any of the "powers or privileges" mentioned, and certainly a joint-stock association for banking purposes has some such powers or privileges and therefore is included in the term "corporation." This is clearly the logical conclusion indicated by the premises.

If, therefore, the framers of the Constitution had intended that the provision of section 18 should apply to every corporation, whether organized for banking, manufacturing, commercial, mining or other legitimate purposes, all that would have been necessary to have made such intention manifest, beyond reasonable controversy, would have been to have omitted the words, "and joint-stock association for banking purposes," but not having done this it is not the province of the courts to destroy their use and effect by construction. These words were evidently employed for the purpose of limiting the additional liability, provided for in the section, to corporations and joint-stock associations organized for banking purposes the value of the stock of which is not so fluctuating and uncertain as that of other corporations. They were employed, therefore, as words of limitation, and for the purpose of designating what kind of corporations should be affected by the additional liability, thus continuing the long-settled policy of the Territory of Utah, as to all corporations, unchanged in the State of Utah. The intention thus clearly manifested from

the context can not, as we have seen, be permitted to be changed because of the punctuation, and the section must be read with a comma after the word "stockholders," and with the one after the words "every corporation," stricken out.

The intention of the framers of the Constitution, as to the application of section 18, was also clearly manifested in their discussions upon this subject. In the official report of the proceedings of the constitutional convention, it appears that an effort was made to insert into the Constitution a similar provision, making the stockholders of insurance companies likewise liable for the debts of the corporation, but after considerable debate, a motion to strike out such provision, which had been reported by the committee, prevailed. Of. Rep. Const. Conv., vol. 2, pp. 1578-1583. Afterwards a motion to strike out the provisions contained in section 18, referring to banking institutions, was defeated. Id., p. 1599. An examination of the discussions, relating to these provisions, shows a manifest purpose, on the part of that convention, to have the provision of section 18 apply to banking institutions and to no other corporation. Id., pp. 1578-1583, 1597-1599.

That such was the design of the framers of our fundamental law, is obvious from their own proceedings.

"While, in general, those proceedings are less conclusive in determining the proper construction of a provision of the Constitution than are legislative proceedings in determining the construction of a statute, still, where, as here, the inquiry is designed to ascertain the purpose sought to be accomplished by a particular provision, an examination of the proceedings of the convention which framed the instrument is proper, and if, as appears in this case, the proceedings clearly show the purpose, their aid in interpretation is valuable." State v. Norman, 16 Utah 457; Cooley, Const. Lim., 80-83.

Entertaining the views hereinbefore expressed, we do

not deem it important to decide any other question presented.

Upon careful examination of the evidence and from the foregoing considerations, we are clearly of the opinion that the court erred in the decision of this case. The judgment must, therefore, be reversed with costs, and the case remanded to be disposed of according to law.

It is so ordered. *Baskin, J.,* concurs.

HART, D. J. *(Concurring)*—I concur fully in the doctrine laid down in the foregoing opinion and agree with the judgment without qualification or restriction so far as concerns D. F. Walker, Jr., the only defendant to move for a new trial in the court below. As to all the other defendants who did not move for a new trial, counsel invoke the rule laid down in the case of Swenson v. Snell (Utah), 61 Pac. 555, "That on appeal of an equitable action, the appellate court can not consider the testimony for the purpose of ascertaining whether the findings of fact are supported by the evidence unless a motion for a new trial has been interposed and ruled on in the court below." Notwithstanding the importance of the decision of the case at bar, as affecting mining and other interests in this State, I fail to find in that any reason why said appellants should not have the benefit of the foregoing rule in Swenson v. Snell, so long as the same remains in force. As to the merits of that rule under a practice which allows an appeal on questions of fact in equity causes, I do not feel called upon to express an opinion at this time, but simply hold that the same should be followed unless modified.