*This opinion is subject to revision before final publication in the Pacific Reporter*

**2018 UT 1**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

JUDITH PINBOROUGH ZIMMERMAN, PH.D,
*Plaintiff,*

*v.*

UNIVERSITY OF UTAH and DR. WILLIAM MCMAHON,
*Defendants.*

No. 20160572
Filed January 23, 2018

On Certification from the
United States District Court for the District of Utah
The Honorable Jill N. Parrish
Case No. 2:13-cv-1131-JNP

Attorneys:

April L. Hollingsworth, Salt Lake City, for plaintiff

Sean D. Reyes, Att'y Gen., Tyler R. Green, Solic. Gen., Stanford E. Purser, Deputy Solic. Gen., Peggy E. Stone, Asst. Solic. Gen., Salt Lake City, for defendants

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court, in which CHIEF JUSTICE DURRANT, JUSTICE HIMONAS, PRESIDING JUDGE ORME, and JUDGE BROWN joined.

Having recused himself, JUSTICE PEARCE does not participate herein; COURT OF APPEALS PRESIDING JUDGE GREGORY K. ORME sat.

Due to her retirement, JUSTICE DURHAM did not participate herein; DISTRICT COURT JUDGE JENNIFER A. BROWN sat.

JUSTICE PETERSEN became a member of the Court on November 17, 2017, after oral argument in this matter, and accordingly did not participate.

———————

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶1　This case comes to us on certification from the United States District Court for the District of Utah. UTAH R. APP. P. 41. The certified questions are as follows:

> 1. Is the Free Speech Clause of the Utah Constitution self-executing?
> 2. If question 1 is answered in the affirmative, what are the elements of a claim brought under the clause?
> 3. Does an employee who receives notice that his or her employment will be terminated effective on a future date suffer an adverse employment action for purposes of the Utah Protection of Public Employees Act when he or she receives the notice, when the employment is actually terminated, or both?

These are important questions. The first two, in particular, are matters of first impression of great significance. Clearly that is why Judge Parrish certified these matters for our decision, and why we accepted the certification.

¶2　Our authority to answer certified questions, however, is a matter of discretion. UTAH CONST. art. VIII, § 3; UTAH R. APP. P. 41. The power to elect to decide a certified question encompasses the power to decline to resolve it conclusively in appropriate circumstances. And on reflection we see reasons not to render a conclusive answer to the first two questions certified in this case. Because these questions are not adequately briefed by the parties we decline to resolve them here. Instead we answer only the third question, which is squarely presented and amply addressed in the parties' briefs.

¶3　On the third question, we hold that a *notice of termination* may be an adverse employment action independent of an *actual termination* under the Utah Protection of Public Employees Act (UPPEA). We also set forth an analytical framework for assessing whether such employment actions are independent of each other

under the UPPEA, while leaving the application of this standard for the United States District Court in the first instance.

I

¶4    Dr. Judith Zimmerman filed a federal lawsuit against Dr. William McMahon and the University of Utah (University), asserting claims (among others) arising under the Utah Constitution and the UPPEA, Utah Code section 67-21-3. We state the facts of relevance to her claims as described by the United States District Court in the order of certification.

¶5    Dr. Zimmerman is a speech-language pathologist. She entered into a contract with the University in 2008. Pursuant to the contract, Dr. Zimmerman was appointed as a research assistant professor for a "renewable one-year term." The contract stated that her appointment "will subsequently be renewed each year thereafter, contingent on [her] progress and the availability of funds, for successive terms of one (1) year unless either [she] or the University gives written notice to the other of its intent not to renew [her] appointment." Dr. Zimmerman's employment contract was subsequently renewed until her termination in June of 2013.

¶6    Dr. Zimmerman's research focused on autism in Utah. She worked under a grant from the Centers for Disease Control and Prevention (CDC). Dr. Zimmerman and her team collected data about pre-identified students from schools and medical facilities, including private health and educational information. Their data collection was subject to HIPPA and FERPA regulations, as well as protocols established by the CDC. In addition, the University required the research to be approved by the Institutional Review Board, and individual researchers were also required to seek approval from the Utah Department of Health to use health data in a research study.

¶7    In 2012, Dr. Zimmerman concluded that a University employee had copied confidential data in violation of governing laws and regulations. In August, she reported her concerns regarding research misconduct and privacy violations to the University. She alleged that the data was shared with individual researchers, including Dr. McMahon, in violation of

confidentiality and privacy agreements and potentially in violation of federal privacy laws. Dr. Zimmerman also reported to the University's legal department that she believed University employees were "double-dipping" because time spent on research for one group was being charged as time to another group of researchers.

¶8 On December 12, 2012, Dr. McMahon delivered a letter to Dr. Zimmerman notifying her that her contract would not be renewed. Her employment with the University ended on June 30, 2013. Dr. Zimmerman served a Notice of Claim on October 25, 2013, and filed this action on December 27, 2013.

¶9 Dr. Zimmerman brought claims against the University and Dr. McMahon for, among other things, infringement of her free speech rights under the Utah Constitution and under the UPPEA. The University moved for summary judgment. First, it asserted that Dr. Zimmerman had no private right of action under the free speech clause of the Utah Constitution, which the University viewed as not self-executing. Second, it contended that the UPPEA claim was time-barred—asserting that Dr. Zimmerman suffered an adverse employment action upon receiving notice that her contract would not be renewed, and noting that she had not asserted her claim within 180 days of that action as required by section 67-21-4 of the Utah Code.

¶10 The United States District Court determined that the University's motion implicated important, unresolved questions of state law. And it accordingly certified these questions for our review.

II

¶11 The federal court's certification order identified three questions of state law. The first two are of relevance to Dr. Zimmerman's free speech claim under the Utah Constitution. They ask us to decide whether the Utah free speech clause is "self-executing" and, if so, to identify the elements of a free speech claim under the Utah Constitution. The third question is of relevance to Dr. Zimmerman's UPPEA claim. It asks us to identify the "adverse employment action" triggering the 180-day filing requirement under the UPPEA.

¶12 These are important questions of first-impression—questions on which this court should and will one day have the final say. For that reason we can certainly understand the U.S. District Court's decision to certify these issues for our review. That said, the briefing and procedural posture of this case make it difficult for us to render a confident answer to the first two questions presented. And for reasons explained below we decline to exercise our discretion to resolve these questions on the briefing that is now before us. Instead we answer only the third question, reserving the first two for another day.

A

¶13 "The posture of a matter certified to us by a federal court is unusual." *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Horne*, 2012 UT 66, ¶ 7, 289 P.3d 502. In deciding certified questions we are not reviewing a decision of a lower court. Typically we are addressing abstract questions of law, albeit "in a context and manner useful to the resolution of a pending federal case." *Id.* ¶ 8.

¶14 If this case were before us on appeal we would have the benefit of a lower court's disposition of Dr. Zimmerman's claims. We would also be presented with the legal standards adopted by the trial court and the application of those standards to the evidence in the record. In a case involving both statutory and constitutional claims, moreover, we might well have a basis for deciding the case on purely statutory grounds while avoiding the constitutional question.

¶15 None of this is available to us here. We have no articulation of the constitutional standard deemed appropriate for disposition of the case by a trial court. And we have no application of that standard to the evidence presented by the parties below. Without such application, moreover, we are not in a position to avoid the constitutional question presented by resolving the case on purely statutory grounds.[1]

---

[1] *See W. v. Thomson Newspapers*, 872 P.2d 999, 1005 (Utah 1994) ("[C]ourts should avoid reaching constitutional issues if the case

¶16 These obstacles alone are not insurmountable. In an appropriate case, we could answer constitutional questions on certification from a federal court. But we have determined that this is not an appropriate case. We reach that conclusion because the above-noted problems are exacerbated here by the limited nature of the briefing presented by the parties.

¶17 The question of the basis for and elements of a free speech claim under the Utah Constitution is a sensitive one. To decide whether Dr. Zimmerman has a private right to sue for damages under the Utah free speech clause we would first have to decide that this provision is self-executing. *Spackman ex rel. Spackman v. Bd. of Educ. of the Box Elder Cty. Sch. Dist.*, 2000 UT 87, ¶¶ 7–9, 16 P.3d 533. "A constitutional provision is self-executing if it articulates a rule sufficient to give effect to the underlying rights and duties intended by the framers" of our constitution. *Bott v. DeLand*, 922 P.2d 732, 737 (Utah 1996) (citation omitted), *abrogated on other grounds by Spackman*, 2000 UT 87. "In other words, courts may give effect to a provision without implementing legislation" if we find a basis for concluding that "the framers intended the provision to have immediate effect and if 'no ancillary legislation is necessary to the enjoyment of a right given, or the enforcement of a duty imposed.'" *Id.* (citation omitted). "Conversely, constitutional provisions are not self-executing if they merely indicate a general principle or line of policy without supplying the means of putting them into effect." *Id.* (citation omitted).

¶18 This threshold inquiry, as noted, turns in large part on an originalist inquiry. To conclude that a constitutional provision is self-executing we would need to discern the original meaning or intent of the constitutional provision in question—whether the "framers intended the provision to have immediate effect" without implementing legislation or whether instead its terms would be understood as a "general principle or line of policy" requiring a legislative act to "put[] [it] into effect." *Id.* (citation omitted).

---

can be decided on other grounds[,] . . . including common law or statutory grounds." (citations omitted)).

¶19 Yet the parties have unfortunately offered little insight into these questions. Their briefing is largely superficial on this threshold question. Instead of delving into the original meaning of the constitutional text the parties mostly point us to analogous case law in Utah and in other jurisdictions on arguably parallel constitutional provisions. Decisions from sister states may be helpful as far as they go. If a decision from another court on a state constitutional question includes analysis that persuades us as to the correct interpretation of our constitution, we may certainly look to such decisions. But sister state decisions are by no means binding on us. And the threshold question presented here calls out for careful analysis of the precise terms of the Utah Constitution and its original meaning to aid in our determination of whether the "framers intended the provision to have immediate effect" without implementing legislation. *Id.* The absence of adversary briefing on this question reinforces our reluctance to venture into this constitutional territory.[2]

¶20 Our reluctance is heightened, moreover, by the absence of adversary briefing on a second-level inquiry called for under our cases. Before we could determine that Dr. Zimmerman had a private right of action to sue for damages under the Utah free speech clause we would have to decide not only that this provision is self-executing but also that a "common law" standard for a constitutional claim for money damages is satisfied. *Spackman*, 2000 UT 87, ¶¶ 20, 26. That standard would require

---

[2] Despite its contrary argument to the district court, the University conceded before us that article I, section 15 of the Utah Constitution is self-executing. And that concession left Dr. Zimmerman with little incentive to address this issue at any length. For that reason the limited briefing before us is understandable. But it leaves us wanting for more guidance before we resolve a question of this significance. *See City & Cty. of S.F., Cal. v. Sheehan*, 135 S. Ct. 1765, 1773 (2015) (dismissing writ of certiorari as improvidently granted where adverse party abandoned the position it took in the lower court; noting that the question presented "would benefit from briefing and an adversary presentation").

proof of three elements: (a) that the violation of the Free Speech Clause is "flagrant" in the sense that it infringes "clearly established" constitutional rights, *id.* ¶ 23; (b) that "existing remedies" do not redress Dr. Zimmerman's injuries, *id.* ¶ 24; and (c) that "equitable relief, such as an injunction, was and is wholly inadequate to protect the plaintiff's rights or redress . . . her injuries," *id.* ¶ 25.

¶21 Dr. Zimmerman does not address these issues in her briefing to this court. She presents no analysis of any of these common law elements under *Spackman*. Her position instead is rooted in a basic syllogism: It is wrongful for an employer to terminate a worker for exercising her free speech rights, and a constitutional free speech claim should accordingly consist of the elements of a "wrongful termination" claim under our case law.

¶22 The University's briefing delves into a bit more depth. The University doesn't just identify a common law claim that it seeks to have us clothe in constitutional garb. It identifies a body of federal free speech case law—under *Connick v. Myers*, 461 U.S. 138 (1983), and *Pickering v. Board of Education of Township High School District 205, Will County, Illinois*, 391 U.S. 563 (1968)—that it wants us to import into state free speech law. But the University makes no attempt to connect this case law with the text or original meaning of the Utah Constitution. It just cites the federal cases and encourages us to make them a part of Utah constitutional law. And that is insufficient.[3]

¶23 We are reluctant to tread into these important constitutional waters without more in depth adversary briefing.

---

[3] *Met v. State*, 2016 UT 51, ¶ 44, 388 P.3d 447 ("As we have explained, cursory references to the state constitution within arguments otherwise dedicated to a federal constitutional claim are inadequate. When parties fail to direct their argument to the state constitutional issue, our ability to formulate an independent body of state constitutional law is compromised. Inadequate briefing denies our fledgling state constitutional analysis the full benefit of the interested parties' thoughts on these important issues." (citations omitted) (internal quotation marks omitted)).

Dr. Zimmerman's invitation to import wrongful termination law into the Utah free speech clause is insufficient. *Spackman* requires analysis, at a minimum, of whether "existing remedies" are sufficient to protect Dr. Zimmerman's interests. 2000 UT 87, ¶ 24. And Dr. Zimmerman's briefing essentially just identifies *an existing remedy*—a claim for wrongful termination—as her proposed basis for establishing a constitutional claim for money damages.

¶24 The University's approach comes closer to providing the material we would need to assess the viability of a constitutional free speech claim for damages and to identify its elements. But even the University's approach falls short. The University is asking us to import an established body of federal case law into the Utah Constitution. And it does so without any independent analysis of the distinctive text and original meaning of the Utah free speech clause. That is also insufficient.

¶25 To establish the elements of a Utah free speech claim we would need to start, at a minimum, with a careful analysis of the text of the Utah Constitution, as understood when it was adopted in the late nineteenth century.[4] This has been our primary mode of

---

[4] *See Am. Bush v. City of S. Salt Lake*, 2006 UT 40, ¶ 66, 140 P.3d 1235 (Parrish, J., majority opinion) (interpreting Utah free speech clause not in terms of policy arguments or modern preferences but in light of originalist inquiry; explaining that "[i]t is not our place" to "substitut[e] our own value judgment for that of the people of Utah when they drafted and ratified the constitution"); *id.* ¶¶ 79, 82 (Durrant, J., concurring) (noting that it is "enticing to adopt an interpretive technique whereby we, as judges, look to our own attitudes and views to discern the contours of the protective boundary erected by our state constitution," and explaining that this "is more akin to dictating than judging"); *Neese v. Utah Bd. of Pardons & Parole*, 2017 UT 89, ¶ 67, __ P.3d __ ("[T]his court should look to the original meaning of the Utah Constitution when properly confronted with constitutional issues.").

constitutional interpretation since the founding of the state.[5] And although we may look to case law from sister states or from the federal realm to inform our thinking, such cases are merely secondary. They may be helpful insofar as they persuade us as to the correct understanding of the Utah Constitution at the time of its adoption. But they are by no means controlling. *State v. Tiedemann*, 2007 UT 49, ¶ 33, 162 P.3d 1106 ("This court . . . has the authority and obligation to interpret Utah's constitutional guarantees, . . . and we owe federal law no more deference in that regard than we do sister state interpretation of identical state language." (citations omitted)).

¶26 For that reason the University's approach is also inadequate to inform our determination of the elements of a Utah free speech claim. Thus, we are left without a basis in the parties' briefing for resolving the first two questions certified for our review. And we accordingly decline to offer an answer.

¶27 We are reluctant to take this course. We appreciate the significance of the free speech questions certified by the federal court. And our acceptance of the certification would ordinarily

---

[5] *See* Jeremy M. Christiansen, *Some Thoughts on Utah Originalism: A Response*, 2014 UTAH L. REV. ONLAW 1, 5–6 & nn.26–36, 9–10 & nn.59–64 (citing and discussing this court's approach to constitutional interpretation over time, and concluding that the prevailing approach has largely been originalist (citing *Richardson v. Treasure Hill Mining Co.*, 65 P. 74, 81 (Utah 1901)) (interpreting article XII, section 18 by examining "[the framers'] discussions upon this subject[] [i]n the official report of the proceedings of the constitutional convention") (second and third alterations in original)); *Ritchie v. Richards*, 47 P. 670, 679 (Utah 1896) (per Batch, J.) (interpreting the secret ballot provision of article IV, section 8 and choosing the meaning of "secret" that was "in harmony with public thought and expression respecting the ballot systems at the time of and before the holding of the constitutional convention"); *State v. Elliott*, 44 P. 248, 251 (Utah 1896) (discerning the intent "of the framers of our fundamental law" in determining the scope of the "writ of quo warranto" in article VIII, section 4).

put us on a path to providing an answer. Our jurisdiction in answering certified questions, however, is elective. The decision to accept such questions is a matter of our discretion. *See* UTAH R. APP. P. 41(e) (recognizing our authority to "enter an order either accepting or rejecting the question[s] certified" by a federal court). And that discretion necessarily encompasses the authority to decline to provide a conclusive answer after reviewing the parties' briefing.

¶28 We therefore decline to give a conclusive answer to the question whether the Utah free speech clause is self-executing or to prescribe the elements of a free speech claim in the circumstances of this case. The answer to these questions may yet prove crucial to the disposition of this case. But the parties have not given us the kind of adversary briefing that we would need to resolve these important issues with confidence, and we therefore decline to do so.

B

¶29 The third question certified by Judge Parrish is more amply addressed by the parties in their briefing. This question concerns the identification of the event that triggers the 180-day filing requirement under the UPPEA. The governing provision requires that "an employee who alleges a violation" of the UPPEA file a claim "within 180 days after the occurrence of the alleged violation" of the statute. UTAH CODE § 67-21-4(1)(a). In this case, the alleged violation is an "adverse [employment] action" undertaken because an employee has "communicate[d] in good faith . . . a violation or suspected violation of a law, rule, or regulation." *Id*. § 67-21-3(1)(a).

¶30 The certified question asks whether "an employee who receives notice that his or her employment will be terminated effective on a future date suffer[s] an adverse employment action for purposes of the Utah Protection of Public Employees Act when he or she receives notice, when the employment is actually terminated, or both[.]" Order Certifying Question to the Utah Supreme Court at 1, *Zimmerman v. Univ. of Utah*, No. 2:13-cv-1131 (D. Utah July 1, 2016). Our answer, which we explain further below, is that either or both of these actions conceivably could be

an "adverse employment action" triggering the 180-day clock—and that the precise answer depends on whether and to what extent the employee is seeking damages arising out of one or the other of these actions (or both). To the extent an employee is seeking damages that arise from a notice of termination, a claim for those damages would be foreclosed by the failure to file within 180 days of the notice. To the extent an employee is seeking damages arising from the actual termination, on the other hand, a claim for those damages would not be foreclosed unless the employee fails to file a claim within 180 days of the actual termination.

¶31 This framework is dictated by the plain language and structure of the UPPEA. The statute says that an adverse employment action occurs when an employer "discharge[s], threaten[s], or discriminate[s] against an employee in a manner that affects the employee's employment, including compensation, terms, conditions, location, rights, immunities, promotions, or privileges." UTAH CODE § 67-21-2(2). That means that both a threat of termination and an actual termination could trigger a claim under the UPPEA.

¶32 Thus, we think the University has a point in asserting that Dr. Zimmerman had a claim that accrued upon her receipt of its notice of termination of her contract. When that happened (in December 2012) Dr. Zimmerman allegedly suffered an actionable adverse employment action. And to the extent she seeks damages in the underlying federal proceeding for injuries suffered as a result of the December 2012 notice of termination her claim would be time-barred under the UPPEA.

¶33 That may not be the end of the matter, however. Dr. Zimmerman also seems to have identified a separate adverse employment action that occurred in June 2013—when her employment was actually terminated. Dr. Zimmerman apparently alleges that this was a separate, actionable employment action. And because she filed her UPPEA claim within 180 days of that action, it would appear that she may be entitled to recover damages she can show to be causally connected to that separate action.

¶34 The determination of whether a plaintiff's cause of action is time-barred requires precision in identifying "precisely the 'unlawful employment practice' of which [s]he complains." *Del. State Coll. v. Ricks*, 449 U.S. 250, 257 (1980) (articulating a parallel standard of proof under Title VII and 42 U.S.C. § 1981). We are not asked here to decide conclusively whether or to what extent Dr. Zimmerman's UPPEA claim is time-barred. But we are asked to clarify the legal framework that will govern that determination. And we conclude that the UPPEA does not exclude the possibility of the actual termination of Dr. Zimmerman's employment as a separate adverse employment action. Indeed the statutory definition of "adverse action" seems clearly to suggest that actual termination could sustain the assertion of a separate, independent claim.

¶35 Whether it does qualify will depend on the evidence presented in the federal district court. Under the UPPEA it is Dr. Zimmerman's burden not just to identify an adverse employment action but also to establish that any such action adversely affected her "employment, including compensation, terms, conditions, location, rights, immunities, promotions, or privileges." UTAH CODE § 67-21-2(2). This question of causation will be a crucial determinant of the timeliness of Dr. Zimmerman's UPPEA claim. To the extent her damages are causally connected to the notice of termination they would be time-barred; but to the extent they are causally connected to the actual termination of her employment they would not be time-barred.[6]

¶36 We are not asked to sort out this causation question here. We leave that matter to the federal district court in subsequent proceedings.

---

[6] *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113–14 (2002) ("Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice,'" and "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.").